# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 27, 2005          Decided May 3, 2005

No. 05-5131

CSX TRANSPORTATION, INC.,
APPELLANT

v.

ANTHONY A. WILLIAMS, IN HIS OFFICIAL CAPACITY AS
MAYOR OF THE DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

On Emergency Motion for Injuction Pending Appeal and
for Motion for Summary Reversal

———

*Carter G. Phillips* argued the cause for the appellant. With him on the motion for injunction and summary reversal were *Virginia A. Seitz*, *Irvin B. Nathan*, *Mary Gabrielle Sprague*, *Sidney A. Rosenzweig*, *Kathryn E. Taylor*, *Peter J. Shudtz* and *Paul R. Hitchcock*.

*Douglas N. Letter*, Litigation Counsel, United States Department of Justice, argued the cause for *amicus curiae* United States of America in support of the appellant. With him on the response were *Kenneth L. Wainstein*, United States Attorney, *Gregory G. Katsas*, Deputy Assistant Attorney General, *Irene M. Solet*, Attorney, and *Jeffrey A. Rosen*, General Counsel, United States Department of Transportation, and *Paul Geier*, Assistant General Counsel.

*G. Paul Moates* and *Terence M. Hynes* were on the response of *amicus curiae* Norfolk Southern Railway Company in support of the appellant.

*Edward E. Schwab*, Deputy Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellees Anthony A. Williams et al. With him on the opposition were *Robert J. Spagnoletti*, Attorney General, and *Mary L. Wilson*, Assistant Attorney General.

*James R. Wrathall* argued the cause for appellee Sierra Club. With him on the opposition were *Brian Boynton* and *James B. Dougherty*.

Before: HENDERSON, RANDOLPH and ROBERTS, *Circuit Judges*.

Opinion for the court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* HENDERSON.

PER CURIAM: The District of Columbia City Council (D.C. Council) has passed an ordinance, the Terrorism Prevention in Hazardous Materials Transportation Emergency Act of 2005 (D.C. Act), banning all shipments by rail or truck of certain hazardous materials within 2.2 miles of the United States Capitol. CSX Transportation, Inc. (CSXT) has filed an emergency motion seeking reversal of the district court's denial of a preliminary injunction against enforcement of the D.C. Act. Because we conclude that CSXT has satisfied the standards for a preliminary injunction, we reverse the district court and remand with direction to the district court to enter a preliminary injunction.

## I.

The D.C. Council passed the D.C. Act on February 1, 2005 in an effort to reduce the risk of a terrorist attack on shipments of hazardous materials near the United States Capitol. Mayor

Anthony Williams signed the D.C. Act on February 15, 2005. The D.C. Act prohibits the shipment by rail or truck of hazardous materials in specified categories, including explosives, flammable gases, poisonous gases and other poisonous materials (Banned Materials), within 2.2 miles of the United States Capitol Building (Capitol Exclusion Zone) without a permit from the D.C. Department of Transportation (DCDOT). *See* D.C. Act § 4(a).[1] Because the D.C. Act is emergency legislation, it was passed on only one reading by the D.C. Council, was not reviewed by the Congress and is effective for only 90 days. *See* Home Rule Act §§ 412(a) (D.C. Code § 1-204.12); 602(c)(1) (D.C. Code § 1-206.02).[2]

On February 16, 2005, CSXT sued the District of Columbia (District) and Mayor Williams, in his official capacity, in district court, seeking a declaration that the D.C. Act is invalid and an

---

[1] The D.C. Act provides that DCDOT may issue a permit for rail or motor carrier transportation otherwise banned only upon a showing that "there is no practical alternative route," *id*. § 5(a), and that DCDOT may condition any permit on the adoption of safety measures, including time-of-day restrictions and the payment of fees in exchange for operating rights. *See id*. § 5(a) and (b). "Practical alternative route" is defined as any route "(A) [w]hich lies entirely outside the Capitol Exclusion Zone" and "(B) [w]hose use would not make shipment of the materials in question cost-prohibitive." *Id*. § 3(4).

[2] On March 1, 2005, the D.C. Council passed the Terrorism Prevention in Hazardous Materials Transportation Temporary Act of 2005 (Temporary Act), which is substantively identical to the D.C. Act but is not emergency legislation. Mayor Williams signed the Temporary Act on March 17, 2005 and it was transmitted to the Congress for review, pursuant to D.C. Code § 1-206.02(c), on March 22, 2005.

injunction against its implementation and enforcement. CSXT is a Class I freight railroad that operates a north-south rail line from Florida to Boston and an east-west line from the District of Columbia to Chicago and St. Louis. For decades, CSXT has regularly transported Banned Materials on these two lines, both of which pass through the Capitol Exclusion Zone. CSXT alleges that the D.C. Act would require extensive rerouting of Banned Materials to CSXT's other rail lines, resulting in a significant increase in the total miles over which such materials travel and the total time the materials are in transit. *See* Amended Complaint ¶¶ 71-73.

CSXT asserts the D.C. Act is preempted by the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101-20153.[3] *See id.* ¶ 98. Accordingly, on February 22, 2005 CSXT moved for a preliminary injunction, seeking to enjoin enforcement of the D.C. Act. In a Statement of Interest filed on February 25, 2005, the United States made clear that it also believes the D.C. Act is preempted by the FRSA. *See* Statement of Interest at 9-15. The Sierra Club intervened to defend the validity of the D.C. Act. On April 18, 2005 the district court denied the preliminary injunction. Acknowledging that CSXT's legal arguments are "not trivial," the court determined that on the record before it CSXT is not likely to succeed on the merits. *Id*. at 61-63. It also determined that the balance of equities favors the District in light of the potential devastation that could occur in the event of a terrorist attack on a railcar transporting Banned Materials within the Capitol Exclusion Zone. *Id*. at 75. The same day the

---

[3]Because we conclude that CSXT has a substantial likelihood of success on the merits of this argument, this opinion does not address CSXT's other challenges to the D.C. Act under the Hazardous Materials Transportation Act, the Interstate Commerce Commission Termination Act and the Commerce Clause of Article I, section 8 of the United States Constitution.

district court denied preliminary injunctive relief, CSXT filed an emergency motion in this court, seeking reversal of the district court's order.[4]  This court held a hearing on the emergency motion on April 27, 2005.

## II.

In considering whether to grant preliminary injunctive relief, the court must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). The test is a flexible one. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). We have often recognized that injunctive relief may be justified, for example, "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id*. We review the district court's weighing of the four factors under the abuse of discretion standard and its findings of fact under the clearly erroneous standard. *Serono*, 158 F.3d at 1318 (internal citations omitted). To the extent the district court's decision turns on questions of law, however, our review is *de novo*. *Id*. at 1318 (citations omitted).

CSXT and the United States contend that CSXT has a substantial likelihood of success on the merits of the argument

---

[4]We do not address the other relief requested by CSXT in its emergency motion.

that the D.C. Act is preempted by the FRSA. The Congress enacted the FRSA to "promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Section 434 of the FRSA mandates that throughout the United States "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." *Id*. § 20106. Section 20106 of the FRSA delineates the circumstances under which a State may nonetheless act. A State is permitted to enact a law "related to railroad safety or security" until the United States Department of Transportation (DOT) or the United States Department of Homeland Security (DHS) issues a regulation "covering the subject matter of the State requirement." *Id*.[5] Even after such a federal regulation issues, a State may adopt a more stringent law when "necessary to eliminate or reduce an essentially local safety or security hazard" if it "is not incompatible" with the federal regulation and "does not unreasonably burden interstate commerce." *Id*.

CSXT and the United States argue that DOT has "covered the subject matter" addressed in the D.C. Act, *i.e.*, the en route security of hazardous materials transportation by rail, by issuing a final rule, known as HM-232, addressing "Security Requirements for Offerors and Transporters of Hazardous Materials."[6] 68 Fed. Reg. 14,510 (Mar. 25, 2003). HM-

---

[5]CSXT argues that the District of Columbia is not entitled to the statute's safe harbor because it is not a "State." Because we conclude the D.C. Act fails to satisfy the three safe harbor conditions in section 20106, we need not resolve the District's status as a State *vel non*.

[6]FRSA preemption can apply even though HM-232 was expressly promulgated pursuant to the Hazardous Materials

232 was enacted in response to security concerns arising from the terrorist attacks of September 11, 2001 and subsequent threats related to hazardous materials. *See* Notice of Proposed Rulemaking, 67 Fed. Reg. 22,028, 22,028 (May 2, 2002); *see also* 68 Fed. Reg. at 14,511 ("We believe that the new requirements in this final rule will enhance the security of hazardous materials in transportation and, thus, help to deter and prevent terrorists from using hazardous materials in the transportation system as weapons of destruction or intimidation."). Under HM-232, rail carriers (as well as motor carriers) are required to develop and implement security plans for transporting hazardous materials. *See* 49 C.F.R. § 172.800-04. The security plans must address personnel security (such as background checks), unauthorized access to hazardous materials, and, most importantly, *"the security risks of shipments of hazardous materials . . . en route from origin to destination." Id*. § 172.802 (emphasis added). The regulations are enforced through civil penalties. *See* 49 U.S.C. § 5123; 49 C.F.R. §§ 1.49(s), 1.53(b); 49 C.F.R. pt. 107, subpt. D, app. A.

To "cover the subject matter," HM-232 must "substantially subsume" the subject matter of the state law, not merely "touch upon" or "relate to" it. *See CSX Transp., Inc. v. Easterwood*,

---

Transportation Act, 49 U.S.C. § 5101, *et. seq. See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 n.4 (1993) ("[T]he plain terms of § 434 do not limit the application of its express pre-emption clause to regulations adopted by the Secretary pursuant to FRSA. Instead, they state that any regulation 'adopted' by the Secretary may have pre-emptive effect, regardless of the enabling legislation."); *CSX Transp., Inc. v. Pub. Utils. Comm'n of Ohio*, 901 F.2d 497, 503 (6th Cir. 1990) ("In this case, the decision of the district court, applying the FRSA preemption provision to regulations promulgated under the HMTA, retains the essential character and purpose of both statutes.").

8

507 U.S. 658, 66 (1993). In asserting that HM-232 substantially subsumes the subject matter of the D.C. Act, the United States points out that DOT specifically considered and rejected imposing particular security requirements, such as routing restrictions in specific cities. *See* 68 Fed. Reg. at 14,511. *Compare* 67 Fed. Reg. at 22,035 (proposed HM-232 contemplated routing restrictions) *with* 49 C.F.R. § 172.802(a)(3) (final HM-232 does not refer to routing restrictions). Instead, DOT decided that security will best be achieved by adopting performance standards and giving railroads the flexibility to adjust their security plans to their individual circumstances. *See* 68 Fed. Reg. at 14511 ("[T]he flexibility provided by a performance standard permits a company to implement a security plan that is tailored to its specific circumstances and operations."); *id.* at 14,514 ("There is no 'one-size-fits-all' security plan that will be appropriate for each company's individual circumstances."); *id.* at 14,515 ("We continue to believe that, if it is to be effective, a regulation mandating development and implementation of a security plan must provide sufficient flexibility so that a shipper or carrier can adapt its requirements to individual circumstances."). Because HM-232 requires a flexible, individually-tailored security plan for each hazardous material transporter, including measures aimed at en route security, we conclude that CSXT is substantially likely to succeed on its claim that HM-232 covers the subject matter of the D.C. Act.

In effect, the District's complaint is not that the federal government has not covered the subject matter of en route security of rail transport of hazardous materials by HM-232; rather, the District's charge is that HM-232 *inadequately* does so. *See* D.C. Supp. Opp. at 1 ("The United States delegated the responsibility to CSX to protect hazardous cargo from terrorist attack, and CSX has not taken adequate precautions to prevent attacks."); *id.* at 7 (suggesting HM-232 is not comprehensive); *see also* Sierra Club Opp. at 2 (asserting security plans are "not

subject to any substantive federal requirements"); *id*. at 8 (suggesting security plans are insufficient). The FRSA preemption provision, however, authorizes the court *only* to determine whether the regulation covers the subject matter, leaving it to DOT or DHS to gauge the efficacy of the security measures based on the agency's expertise. Neither the court nor the District is authorized or equipped to measure off the adequacy of either agency's strategic determinations. If, as appears likely, HM-232 covers the subject matter of hazardous material rail transportation security, the FRSA permits the District to enact a more stringent law only if it is "necessary to eliminate or reduce an essentially local safety or security hazard" and, then, only if the State law is "not incompatible with a law, regulation or order of the United States Government," and "does not unreasonably burden interstate commerce." 49 U.S.C. § 20106. It does not appear that the D.C. Act satisfies the three conditions.

First, the D.C. Act likely does not address an "essentially local safety or security hazard," as required under the first safe harbor condition of section 20106. The Congress intended that this exception apply "when local situations are 'not capable of being adequately encompassed within uniform national standards.' "*Norfolk & Western Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.2d 567, 571 (6th Cir. 1991) (quoting H.R. Rep. No. 91-1194, at 11 (1970), *reprinted at* 1970 U.S.C.C.A.N. 4104, 4117); *see also Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman*, 542 F.2d 11, 14-15 (3d Cir. 1976) (noting "exception was designed instead to enable the states to respond to local situations which are not statewide in character and not capable of being adequately encompassed within uniform national standards"). No one in this case has suggested that the vulnerability of hazardous material passing through the Capitol Exclusion Zone *cannot* be adequately addressed by national standards. Instead, as noted above, the District and the Sierra Club simply contend the DOT's regulations have not done so.

Further, the purpose of the D.C. Act is to prevent attacks in the vicinity of the United States Capitol by terrorists opposed to our nation or its policies. As the United States has persuasively urged: "The need to protect the United States Capitol and its environs from terrorist attack is and could hardly be a more quintessentially national concern . . . ." U.S. Mem. at 9. The national scope of the problem is underscored by the ongoing efforts of the Transportation Security Administration, in cooperation with rail carriers, "to minimize security risks" and "to assess, develop, and implement enhanced security measures on the rail network, including measures specific to the D.C. Rail Corridor." Mem. Op. at 8; *see also id*. at 26 (describing "D.C. Rail Corridor Project").

Second, the D.C. Act appears to be "incompatible" with HM-232. As noted earlier, HM-232 establishes a flexible regime under which a carrier can tailor its security plan to "its specific circumstances and operations." *See* 68 Fed. Reg. at 14,511; *see also* 49 C.F.R. § 172.802. The D.C. Act's routing restriction does not allow a carrier operating within the Capitol Exclusion Zone to exercise the discretion expressly conferred by HM-232.

Third, it appears the D.C. Act does "unreasonably burden interstate commerce." In assessing the burden, it is appropriate for us to consider the practical and cumulative impact were other States to enact legislation similar to the D.C. Act. *See S. Pac.*, 325 U.S. at 774-75 (focusing on impact of similar state legislation in striking down Arizona statute limiting train lengths as unconstitutional burden on interstate commerce). This is not a speculative exercise. The California Senate currently is considering a bill that would ban hazardous shipments within three miles of the city hall of any "[u]rban region," defined as any city of over 50,000 people. *See* California Senate Bill No. SB 419 Amended (Mar. 31, 2005), *cited in* U.S. Memo. at 17. As the United States asserts, "[i]t would not take many similar

bans to wreak havoc with the national system of hazardous materials shipment." U.S. Mem. at 17.

Given that the D.C. Act does not fall within the safe harbor provided in section 20106, we conclude that CSXT has a strong likelihood of success on the merits of its argument that the D.C. Act is preempted by the FRSA. We note that the case for preemption is particularly strong where, as here, "the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 107 (2000) (concluding Congress had legislated in field of international maritime commerce "from the earliest days of the Republic"); *see CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 648 (E.D. Mich. 2000) ("There can be no doubt that just as Congress has regulated ships and vessels since the beginning of the Republic, it has similarly done so with respect to our Nation's rail system."); *CSX Transp., Inc. v. Pub. Utils. Comm'n of Ohio*, 901 F.2d 497, 499 (6th Cir. 1990) (discussing evolution of federal regulation of hazardous materials transportation by rail).

We further conclude that CSXT has sufficiently demonstrated irreparable injury, given its strong likelihood of success on the merits. *See Cityfed*, 58 F.3d at 747. According to the affidavit of CSXT's vice president for Operations Research and Planning, rerouting trains transporting Banned Materials around the District of Columbia, as the D.C. Act would require, will "significantly decrease the capacity and flexibility of the CSXT rail network" which "is currently operating near or at capacity." Gibson Aff. at 8. The affidavit detailed specific ways in which complying with the D.C. Act would decrease the efficiency of the CSXT system. *Id.* at 9-10. It would be exceedingly speculative, particularly in light of the nature of a complex, interdependent national rail system, to place a dollar figure on the difference in value between the rail network CSXT presently operates and the effectively smaller, more constrained network

that compliance with the D.C. Act would entail. Accordingly, CSXT's injury is properly considered irreparable. *See Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate"); *see also Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 911 (2d Cir. 1989) (upholding finding that "a general cessation of rail service" constituted irreparable harm).[7] With regard to the remaining factors for preliminary injunctive relief, the United States asserts that the rerouting required under the D.C. Act creates security risks because it will increase the length of time hazardous materials are in transit. *See* U.S. Mem. at 17 (citing Federal Railroad Administration Track Safety Standards, 63 Fed. Reg. 33,992, 33,999 (June 22, 1998) ("[T]he risk of releases of hazardous materials is reduced by minimizing the time such shipments spend in transportation. It would be poor policy to allow local governments to attempt to lower their risk by raising everyone's risk and by clogging the transportation system.")). Additionally, the United States asserts the D.C. Act,

---

[7]CSXT also claims as irreparable injury the $2 to $3 million annual cost of complying with the D.C. Act notwithstanding the general rule that injury that "can be remedied with money damages" is not irreparable. CSXT claims it could not recover its costs from the District because the District enjoys eleventh amendment immunity from money damages liability. *See* Emerg. Mot. at 17. Eleventh amendment immunity, however, extends only to States and our case law suggests that the District is not a State for the purpose of the Eleventh Amendment. *See LaShawn A. by Moore v. Barry*, 144 F.3d 847, 853, (D.C. Cir. 1998) ("The term 'state' in the Eleventh Amendment also has been interpreted to include Puerto Rico, *see De Leon Lopez v. Corporacion Insular de Seguros,* 931 F.2d 116, 121 (1st Cir. 1991), but not the District of Columbia. *See LaShawn A. v. Barry,* 87 F.3d 1389, 1394 n.4 (D.C. Cir. 1996)").

and similar bans proposed by other jurisdictions, would disrupt "the national system of hazardous materials shipment." U.S. Mem. at 16-18. Of course, the court does not minimize the calamitous consequences of a terrorist attack on a rail car transporting Banned Materials through the District. The effect of the D.C. Act, however, is simply to shift this risk, or at least some of this risk, to other jurisdictions.

Weighing these factors, we conclude that a preliminary injunction is warranted, especially in light of CSXT's very high likelihood of success on the merits. *See Cityfed*, 58 F.3d at 747. Accordingly, we reverse the district court and remand with direction to enter a preliminary injunction prohibiting enforcement of the D.C. Act.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring:

I join the majority opinion but write separately to express my view that the D.C. Act is likely preempted by the Hazardous Materials Transportation Act (HMTA) as well as by the FRSA.

A "major purpose of the HMTA was the development of 'a uniform, national scheme of regulation' regarding the transportation of hazardous materials." *Chlorine Inst., Inc. v. Calif. Highway Patrol,* 29 F.3d 495, 496-97 (9th Cir. 1994) (quoting *S. Pac. Transp. v. Pub. Serv. Comm'n of Nev.,* 909 F.2d 352, 358 (9th Cir. 1990)); *see also Nat'l Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 824 (1st Cir. 1979) (addressing HMTA and stating: "[T]here is strong support for the notion that a primary Congressional purpose intended to be achieved through the legislation was to secure a general pattern of uniform national regulations."). It was to promote this goal of uniform safety regulation by the federal agencies that the Congress enacted the HMTA preemption provision. *See Colo. Pub. Util. Comm'n v. Harmon,* 951 F.2d 1571, 1580 (10th Cir. 1991) ("[I]n enacting new preemption standards, Congress expressly contemplated that the Secretary would employ his powers to achieve safety by enhancing uniformity in the regulation of hazardous materials transportation."). The preemption provision states:

[U]nless authorized by another law of the United States, a requirement of a State, political subdivision of a State, or Indian tribe is preempted if

(1) complying with a requirement of the State, political subdivision, or tribe and a requirement of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security is not possible; or

(2) the requirement of the State, political subdivision, or tribe, as applied or enforced, is an obstacle to accomplishing and carrying out this chapter, a regulation prescribed under

this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security.

49 U.S.C. § 5125(a). The D.C. Act's ban on rail transport in the Capitol Exclusion Zone appears to be "an obstacle to accomplishing and carrying out . . . a hazardous materials transportation security regulation," namely Department of Transportation regulation HM-232, for the same reason the majority opinion finds the D.C. Act is likely "incompatible with" HM-322 under the FRSA, *see* maj. op. at 10. By prohibiting altogether transport of hazardous material through the Capitol Exclusion Zone in the District of Columbia, the D.C. Act circumscribes the discretion that the regulation expressly confers on CSXT to develop its own individualized security plan under 49 C.F.R. § 172.800, including "[m]easures to address the assessed security risks of shipments of hazardous materials covered by the security plan en route from origin to destination," *id*. § 172.802(a)(3). *Cf*. *Chlorine Inst., Inc.*, *supra* (finding obstacle in California Highway Patrol regulations governing chlorine transport in state); *Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Comty.*, 991 F.2d 458 (8th Cir. 1993) (finding obstacle in tribe's requirement that shippers obtain special license for each shipment of radioactive substances crossing tribal lands); *S. Pac., supra* (finding obstacle in Nevada regulations requiring rail carrier to obtain annual permit before loading, unloading, transferring or storing hazardous material on railroad property within state). The D.C. Act therefore appears to constitute an obstacle to implementation of HM-232 and thus to be preempted under the HMTA, 49 U.S.C. § 5125(a)(2).