# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 11, 2008　　　　　Decided May 6, 2008

No. 07-7092

ESTATE OF FRANCISCO COLL-MONGE,
BY FRANCISCO D. COLL, ADMINISTRATOR, *ET AL.*,
APPELLANTS

v.

INNER PEACE MOVEMENT *ET AL.*,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00271)

*Walter D. Ames* argued the cause for the appellants.

*John D. Mason* argued the cause for the appellees. *Andrew Butz* was on brief. *Joshua D. Sarnoff* and *Richard S. Ugelow* entered appearances.

Before: HENDERSON, TATEL and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellants, the Estate of Coll-Monge and two for-profit corporations owned by testator Francisco Coll, (collectively the

Estate), brought this action for trademark infringement and related claims against two non-profit corporations that Coll founded—Inner Peace Movement, Inc. (IPM) and Peace Community Church (PCC) (jointly the Non-Profits). The Estate alleged that it is the sole registered owner of five marks Coll registered with the United States Patent and Trademark Office (USPTO). The Non-Profits—which use the marks—countered that they are the sole owners and that, when Coll registered the marks, he did so in his representative capacity on their behalf. The district court granted summary judgment to the Non-Profits on the trademark claims, concluding that on the undisputed facts they, as the sole users of the marks from the beginning, are also the sole owners and that Coll registered the marks on their behalf. In reaching its decision, the court held the "related companies" doctrine—under which registration of a mark used by a related company inures to the benefit of the owner—inapplicable to a non-profit corporation. We conclude that the district court erred in its "related companies" holding and that there remain disputed issues of fact regarding both the doctrine's applicability here and the capacity in which Coll registered the marks with the USPTO. Accordingly, we reverse the district court's summary judgment on the Estate's trademark claims and affirm the denial of the Estates's partial summary judgment motion. On the other hand, we affirm the district court's assessment against the Estate of the cost of mailing "remedial notices" pursuant to a temporary restraining order it issued before entering summary judgment.

## I.

The following facts are undisputed. Coll co-founded IPM in January 1964 and PCC in October 1965 to promote his "Inner Peace Movement" self-actualization program.[1] Coll was

---

[1]According to IPM's by-laws, the "Inner Peace Movement is dedicated to the principle that each man's religion must be a way of

president of each of the Non-Profits as well as on the board of directors of each. Coll also founded three for-profit corporations: (1) Americana Leadership College, Inc., incorporated in 1976, which assisted the Non-Profits with promotion, administration and financing; (2) Alley Copyrights, Inc., incorporated in 1977, which published, stored, distributed and registered with the U.S. Copyright Office educational materials used by the Non-Profits; and (3) Employee Services Personnel, Inc., incorporated in 1984, which did accounting work for the Non-Profits. All three for-profit corporations are owned by a parent holding company, Wayshowers, Inc., of which Coll was the sole shareholder.

Between 1992 and 1995, Coll registered with the USPTO the five service marks[2] at issue: the words "Inner Peace Movement,"

---

life in today's world" and "provides leadership and suggestions for the development of inner spiritual guidance and the unfolding of each person's spiritual gifts (I Cor. 12:4-11) that bring new faith, balance and freedom from fear to each individual." IPM's Rev. 1st Am. Answer & Countercls. tab C, at 1.

[2]Under the Lanham Act, which governs federal trademark registration and rights, the marks at issue are technically "service marks" rather than "trademarks" because they are used in connection with services rather than goods. *See* 15 U.S.C. § 1127 (defining "trademark" as "any word, name, symbol, or device, or any combination thereof" a person uses or intends to use "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown" and defining "service mark" as "any word, name, symbol, or device, or any combination thereof" a person uses or intends to use "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown"). The Lanham Act generally treats service marks and trademarks the same. *See* 15 U.S.C. § 1053 ("Subject to the provisions relating to the

4

the words "Peace Community Church," the "IPM" word/emblem, PCC's "Dove and Olive Branch" emblem and a "Circle of Love" emblem. On December 15, 1999, Coll died, leaving his estate to his son, Francisco David Coll.

In February 2001 the Estate of Coll-Monge, joined by Americana Leadership College, Inc. and Alley Copyrights, Inc., filed this action against the Non-Profits, three named individuals[3] and 20 "John Does," setting out seven claims, including Counts I and II which allege trademark infringement under, respectively, the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., and the common law.[4] In their amended answers, IPM and PCC asserted various counterclaims alleging, *inter alia*, fraudulent trademark registration, trademark infringement and deceptive trade practices in violation of the Lanham Act and sought cancellation and rectification of Coll's trademark registrations.[5]

registration of trademarks, so far as they are applicable, service marks shall be registrable, in the same manner and with the same effect as are trademarks, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks. Applications and procedure under this section shall conform as nearly as practicable to those prescribed for the registration of trademarks.").

[3]These are Patricia Alexander, Coll's administrative assistant; Cherie Buchanan, Coll's secretary/bookkeeper; and IPM Officer Peter Georgas, who is affiliated with the Americana Leadership College Conference Center in Glendale, Arizona.

[4]The complaint also alleged counts of unfair competition (both common law and statutory), copyright infringement, misappropriation of trade secrets and conversion.

[5]The answers also alleged counterclaims for violation of D.C. Code § 29-514 (now D.C. Code § 29-301.14) (requiring that annual board meetings comply with by-laws), unlawful trade practices in violation of D.C. Code § 28-3904, common law unfair competition,

On June 21, 2001, the Non-Profits applied for a temporary restraining order (TRO) to prohibit the Estate from misleading IPM's board members and others by soliciting them to attend an annual board of directors meeting for the "Inner Peace Movement®" in Osceola, Iowa on July 4, 2001, the same date that IPM's annual board meeting was in fact to be held in San Antonio, Texas. *See, e.g.*, JA 106-07. The Non-Profits alleged that the Estate's use of the name "Inner Peace Movement" was intended to divert attendees from IPM's official board meeting.

On June 27, 2001 the district court issued a TRO restraining "the plaintiffs and their officers, agents, servants, employees and all persons in active concert or participation with any of the foregoing" until July 9, 2001 from

> advertising, promoting, noticing or conducting an annual meeting of the board of directors of Inner Peace Movement, Inc., and/or the Inner Peace Movement®, and/or IPM International, Inc., and/or the plaintiff corporations or any similar or related entity at any time.

TRO 2. The TRO further enjoined the same parties for the same time period from contacting any member of IPM's board of directors about the Osceola meeting and required them to remove website notices of the meeting and to provide the names of "all persons . . . contacted by writing, electronic mail or otherwise, about annual meetings of Inner Peace Movement® or IPM International Inc. so that Inner Peace Movement, Inc. may send remedial notices." *Id*. at 3. The TRO directed that the cost of the mailings be borne by the Estate. *Id*.

In an order filed March 25, 2004, the district court granted summary judgment to the Non-Profits on all seven counts of the complaint and denied the Estate's motion for partial summary judgment on the trademark claims and counterclaims as to the

---

unjust enrichment and conversion.

marks "Inner Peace Movement" and "Peace Community Church." The court concluded that Coll had not been the owner of the subject trademarks because (1) there was "no evidence that Dr. Coll used the IPM and PCC trademarks for his own pecuniary interest independent of the two organizations," (2) the "related companies" doctrine did not apply to a non-profit corporation and (3) Coll "intended to register the trademarks in his representative capacity and did not intend them for his individual benefit." Summ. J. Order 2-3. The court denied the individual defendants' motions for summary judgment on the claims against them, leaving intact those claims and the counterclaims asserted by the Non-Profits. Subsequently, the court granted the Estate's motions to dismiss the claims against the three individual defendants and the 20 John Does and the Non-Profits' motion to dismiss their counterclaims. Accordingly, on May 7, 2007, the court entered final judgment in favor of the Non-Profits.

The Estate filed a notice of appeal on June 6, 2007.

## II.

The Estate appeals two of the district court's rulings: (1) the March 25, 2004 order granting the Non-Profits summary judgment and denying the Estate summary judgment on the Estate's trademark claims (Counts I and II) and (2) the portion of the June 27, 2001 TRO requiring that the Estate bear the cost of sending remedial notices to those persons the Estate had contacted about its Osceola, Iowa "Inner Peace Movement" board of directors' meeting.

### A. Summary Judgment on Trademark Claims

"We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court and drawing all inferences from the evidence in favor of the non-movant." *Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007) (citations omitted). "We may affirm only if there is

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). Applying this standard here, we agree with the Estate that the district court erred in concluding that as a matter of law the Non-Profits owned the marks at issue and that Coll intended to register the marks on their behalf. We address first the underlying issue of ownership through use. *See In re ECCS, Inc.*, 94 F.3d 1578, 1579 (Fed. Cir. 1996) ("most fundamental aspect of United States trademark law" is "that trademark ownership and attendant rights are acquired in the marketplace by use and that the statute, popularly known as the Lanham Act, aside from modern 'intent to use' law not here involved, provides only for registration of existing marks"); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:3 (4th ed. 2005) ("Although a federal registration will give the owner of a mark important legal rights and benefits, the registration does not create the trademark. . . . [T]he absence or cancellation of a registration does not invalidate the trademark. It is the use of the mark to identify a single source which creates exclusive trademark rights.") (footnote omitted).

Ordinarily, a party establishes ownership of a mark by being the first to use the mark in commerce. *See Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) (" '[T]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods.' " (quoting *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975) (alteration added))); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir.) ("With respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it [sic] in commerce."), *cert. denied*, 502 U.S. 939 (1991). Alternatively, the Lanham Act permits an applicant to establish ownership under the "related companies" doctrine by showing that it controlled the first user of the mark. *See Secular Orgs. for*

*Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1130 (9th Cir. 2000) ("[T]o prevail on its trademark claim, [plaintiff] must demonstrate that it was the first user of the disputed marks or, in the alternative, that if [defendant organization] was using the marks first, it was doing so as a related entity and the benefits of any such use should therefore inure to [plaintiff]."). "Under the doctrine of 'related companies,' the first use of a mark by a person 'controlled by the registrant or applicant for registration of the mark' shall inure to the benefit of the controlling entity." *Id*. at 1131 (quoting 15 U.S.C. § 1055). In this case, it is undisputed that the Non-Profits were the "first users" of the marks at issue but the Estate contends that Coll controlled the Non-Profits' use of the marks, which use therefore inured to his benefit. The district court rejected this argument, reasoning that "[b]ecause the defendants are non-profit organizations with no owners and their actions are controlled solely by their Board of Directors, no one person has control over any actions of the defendants, much less control over the uses of the trademark." Summ. J. Order 3. We conclude the court erred in holding that a non-profit corporation cannot be a related company whose use of the trademark is controlled by a mark's registrant.

The related companies doctrine is embodied in section 5 of the Lanham Act, which provides:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055. The Lanham Act defines a "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." *Id.* § 1127. The statute does not expressly require formal corporate control, as the district court suggested. Instead, the statute requires control over only the "use of a mark . . . with respect to the nature and quality of the goods or services," *id.*, which may include not only corporate control but also licensing agreements and other types of oversight. *See, e.g. Turner v. HMH Pub. Co.*, 380 F.2d 224, 229 (5th Cir. 1967) (concluding under 15 U.S.C. § 1055 plaintiff as licensor "introduced ample evidence to show that [it] fully controlled and dictated the nature and quality of the goods and services used in connection with the trade and service marks by the several [independently owned] licensees"); *see also Carpenter v. Marini*, 2006 WL 2349586, at \*6 (D. Conn. July 11, 2006) ("In certain cases, an individual may control the nature and quality of the goods or services in connection with which a mark is used even if he or she does not own the company that is using the marks."); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:51 (4th ed. 2005) (term "related" "is not limited to control of a company in general" but "simply refers to control over the 'nature and quality of the goods and services in connection with which the mark is used.' " (quoting Roberts, *The New Trademark Manual* 20 (1947)); *id.* (although "superficial reading of the Lanham Act 'related company' provisions might lead one to the conclusion that the 'companies' (meaning 'any person') must be 'related' by some form of stock ownership, such as are parent and subsidiary corporations," . . . "[i]n fact, during the legislative hearings, the Department of Justice wanted to limit the language to 100 percent controlled subsidiaries, and this was rejected." (citing Shinderman, *Trademark Licensing: A Saga of Fantasy and Fact*, 14 Law & Contemp. Probs. 248 (1949); Taggart, *Trademarks and Related Companies: A New Concept in Statutory Trademark*

*Law*," 14 Law & Contemp. Probs. 234, 241 (1949))).  The Estate has offered sufficient evidence of such control to survive summary judgment.

In a 2001 declaration, Coll's ex-wife stated that she had been "in association" with Coll from 1962 to 1985 and that, "[w]hile there was a Board of Directors, [her] late husband was always in complete control of [IPM] and its use of the mark, INNER PEACE MOVEMENT."  Coll Decl. ¶ 2.  In addition, in his 2001 declaration, quondam IPM president Robert Conrad averred that he had been involved in the IPM program since July 1973 and that Coll "shut[] down the Board of Directors," kept IPM "dormant for 4-5 years: from July 1979 to July of 1983 or 1984" and founded the "INNER PEACE MOVEMENT Association . . . to replace [IPM] during its period of dormancy."  Conrad Decl. ¶¶ 3, 6.  Conrad further stated that Coll "controlled the use of the INNER PEACE MOVEMENT mark and merchandizing through multiple distribution channels."  *Id*. ¶ 6.  According to Conrad, Coll's control "extended even to . . . giving specific permission for each traveling leader and lecturer as to their use of the mark in merchandizing their lectures and courses."  *Id*. ¶ 11.  Finally, letters that Coll wrote to the USPTO in response to requests for "clarification" of his trademark registration applications indicate that he controlled the content of the materials the Non-Profits used under the disputed marks.  *See, e.g.*, JA 41 ("The applicant, Dr. Francisco Coll, is the Founder and Director of the PEACE COMMUNITY CHURCH.  There exists a verbal understanding between the applicant and the Peace Community Church that any and all materials (being, books, tapes, letterhead, envelops [sic], brochures, etc.), be reviewed and approved by the applicant prior to use by the Peace Community Church, which mark is the logo for said corporation."); *id*. at 51 ("The applicant as Founder of the, the [sic] Inner Peace Movement, determines the materials the Corporation consistently uses."); *id*. at 55 ("The applicant as President & Founder of the Peace Community Church determines the materials the Corporation consistently uses.").

These documents put into dispute whether or not Coll controlled the use of the Non-Profits' marks from the marks' first use and therefore preclude summary judgment on the ownership issue.[6]

The district court also erroneously found on the evidence before it that Coll necessarily registered the marks in a representative capacity on behalf of the Non-Profits. It is not dispositive, as the court believed, that "[w]hen Dr. Coll registered the trademarks in 1993, he signed the applications as 'founder' and/or 'president' of IPM and PCC." Summ. J. Order 2. The application forms themselves contain indicia that Coll intended to register the marks in his individual capacity. In them, Coll identified himself—"Dr. Francisco Coll"—as the "Applicant" and checked the box next to "Individual" rather than "Corporation." *See, e.g.*, JA 30 (IPM service mark application), 33 (PCC service mark application). In light of the contradictory inferences to be drawn from the applications, summary judgment was inappropriate.

### *B. TRO Costs*

The Estate also contends the district court erred in requiring that the Estate pay the cost of mailing the remedial notices mandated by the TRO. In deciding whether to grant preliminary injunctive relief, the district court "must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). "The test is a flexible one. 'If

---

[6]In 1998, the IPM Board amended its by-laws to provide: "The Founder Dr. Francisco Coll shall have an absolute and overriding power of veto on any decision made by the Executive Committee at all times and in all circumstances." JA 62; *see* also JA 59 (meeting minutes).

the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.' " *Id*. (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). "We review the district court's weighing of the four factors under the abuse of discretion standard . . . ." *Id*. We find no abuse of discretion here.

The TRO did not involve the trademark infringement counts but rather the Non-Profits' counterclaim for deceptive trade practices under section 43(a) of the Lanham Act. Applying the four injunction factors, the district court concluded that (1) the Non-Profits had shown a likelihood of success on the merits because promoting the Osceola, Iowa congress as including a meeting of the board of directors of "Inner Peace Movement®" was "likely to be a violation of the Lanham Act, 15 U.S.C. § 1125(a)," (2) "immediate and irreparable harm will be incurred if [the Estate] or those in active concert with them continue to interfere with the annual meeting of the board of directors of Inner Peace Movement, Inc.," (3) the Estate would not be harmed by issuance of the TRO and (4) injunctive relief was in the public interest. TRO 1-2. In making these determinations, the court did not abuse its discretion. The potential for harm to IPM in the absence of the TRO—the disruption of corporate business resulting from confusion over the site of the official IPM board meeting—was both significant and irreparable. Further, the Non-Profits' likelihood of success on their deceptive trade practices counterclaim was substantial. Section 43(a) of the Lanham Act imposes civil liability on any person who "uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The Estate's conduct in promoting the competing "Inner Peace Movement" board meeting at least

arguably met the statutory criteria. Finally, the Estate was not likely to be harmed by the TRO—except to the extent it was prevented from deceiving persons into attending its own meeting rather than IPM's—and the public interest was served because the deception was mitigated. Because the district court did not abuse its discretion in issuing the TRO, we reject the Estate's challenge to the award of costs thereunder.

Because there remain disputed issues of fact regarding whether Coll controlled the trademarks under the related companies doctrine and in what capacity he registered the marks, neither the Estate nor the Non-Profits are entitled to summary judgment under Federal Rule of Civil Procedure 56. We therefore reverse the district court's March 25, 2004 order insofar as it granted summary judgment to the Non-Profits on the Estate's two trademark claims (Counts I and II). For the same reason, we affirm the order's denial of the Estate's partial summary judgment motion on the two trademark claims. We further affirm the district court's June 27, 2001 temporary restraining order imposing costs on the Estate because the district court did not abuse its discretion therein. Finally, we remand to the district court for further proceedings.

*So ordered.*