Filed 10/17/14  unmodified opinion attached
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| FRIENDS OF THE EEL RIVER, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> NORTH COAST RAILROAD AUTHORITY et al., <br><br>     Defendants and Respondents; <br><br> NORTHWESTERN PACIFIC RAILROAD COMPANY, <br><br>     Real Party in Interest and Respondent. | A139222 <br><br> (Marin County Super. Ct. No. CV1103605) |
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> NORTH COAST RAILROAD AUTHORITY et al., <br><br>     Defendants and Respondents; <br><br> NORTHWESTERN PACIFIC RAILROAD COMPANY, <br><br>     Real Party in Interest and Respondent. | A139235 <br><br> (Marin County Super. Ct. No. CV1103591) <br><br> **ORDER MODIFYING OPINION [NO CHANGE IN THE JUDGMENT]** |


THE COURT:

The opinion filed September 29, 2014, is modified as follows:

On page 30, delete footnote 7, and renumber all subsequent footnotes.

There is no change in the judgment.

1

Appellants' petition for rehearing is denied.



Dated: _____          _____, P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| FRIENDS OF THE EEL RIVER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>NORTH COAST RAILROAD AUTHORITY et al.,<br><br>    Defendants and Respondents;<br><br>NORTHWESTERN PACIFIC RAILROAD COMPANY,<br><br>    Real Party in Interest and Respondent. | A139222<br><br>(Marin County Super. Ct. No. CIV1103605) |
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>NORTH COAST RAILROAD AUTHORITY et al.,<br><br>    Defendants and Respondents;<br><br>NORTHWESTERN PACIFIC RAILROAD COMPANY,<br><br>    Real Party in Interest and Respondent. | A139235<br><br>(Marin County Super. Ct. No. CIV1103591) |

The North Coast Railroad Authority (NCRA), a public agency established by Government Code section 93000 et seq., entered into a contract with the Northwestern Pacific Railroad Company (NWPRC), allowing the latter to conduct freight rail service on tracks controlled by NCRA. Two environmental groups, Friends of the Eel River (FOER) and Californians for Alternatives to Toxics (CAT), filed petitions for writ of mandate under the California Environmental Quality Act (CEQA; Pub. Resources Code,

§§ 21050 et seq., 21168.5) to challenge NCRA's certification of an environmental impact report (EIR) and approval of NWPRC's freight operations. The trial court denied the petitions, concluding CEQA review was preempted by the Interstate Commerce Commission Termination Act (ICCTA; 49 U.S.C. § 10101 et seq.) and rejecting petitioners' claim that NCRA and NWPRC were estopped from arguing otherwise.

FOER and CAT (collectively, petitioners) appeal. They contend (1) the ICCTA preempts only the "regulation" of rail transportation, whereas NCRA agreed to conduct a CEQA review of the rail operations and related repair/maintenance activities as part of a contract allowing it to receive state funds; (2) NCRA and NWPRC are estopped from claiming no EIR was required, due to positions taken in previous proceedings; and (3) the EIR was insufficient because, among other things, it improperly "segmented" the project, given that additional rail operations were contemplated on other sections of the line. We affirm.[1]

## I. STATUTORY OVERVIEW

### A. The ICCTA and Federal Regulation of Railroad Service

"Congress has exercised 'broad regulatory authority' over railroads for more than a century. [Citation.] The Interstate Commerce Commission, created by the Interstate Commerce Act (Feb. 4, 1887, ch. 104, 24 Stat. 379) in 1887, was abolished by the ICCTA in January 1996, and the Surface Transportation Board (STB) was created in its stead. [Citation.] The purpose of the ICCTA was to 'eliminate many outdated, unnecessary, and burdensome regulatory requirements and restrictions on the rail industry.' [Citation.]" (*People v. Burlington Northern Santa Fe Railroad* (2012) 209 Cal.App.4th 1513, 1517 (*Burlington Northern*).)

---

[1]An amicus curiae brief has been filed on behalf of petitioners by the Ecological Rights Foundation, and a joint amicus curiae brief has been filed on behalf of petitioners by the Natural Resources Defense Council, the Planning and Conservation League and the Sierra Club. We have read and considered those briefs in addition to those filed by the parties to the appeal.

The ICCTA grants the STB jurisdiction over rail operations, whether or not they take place entirely within a single state. This jurisdiction "is exclusive. Except as otherwise provided in this part, the remedies provided under this part . . . are exclusive and preempt the remedies provided under [f]ederal or [s]tate law." (49 U.S.C. § 10501(b).)

Before a rail carrier can operate, it must obtain a certificate from the STB giving it permission to do so. (49 U.S.C. §§ 10901, 10902.) Depending on the nature of the proposed operation, the applicant may be required to perform an environmental review under federal law, including the National Environmental Policy Act of 1969 (NEPA). (42 U.S.C. § 4321 et seq.; 49 C.F.R. §§ 1105.6, 1105.7; see *Missouri Min., Inc. v. I.C.C.* (8th Cir. 1994) 33 F.3d 980, 983 (*Missouri Min.*).) The STB may exempt an applicant from normal certification requirements, including environmental review, under certain conditions. (49 U.S.C. § 10502; 49 C.F.R. §§ 1121.1 et seq., 1150.31 et seq.; *Missouri Min.*, at pp. 983-984.) An STB order is subject to judicial review in the federal court of appeals. (28 U.S.C. § 2321(a).)

B. CEQA

CEQA is a comprehensive scheme under California state law designed to provide long-term protection to the environment. (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) It requires public agencies such as NCRA to analyze, disclose and mitigate the significant environmental effects of projects they carry out or approve and to prepare an EIR for any project that may have a significant effect on the environment. (Pub. Resources Code, §§ 21151, 21100, 21080, 21082.2; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379-381.)

In determining what action is appropriate under CEQA, an agency must engage in a three-step process. (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286 (*Tomlinson*).) First, it determines whether an action undertaken, supported or approved by a public agency amounts to a "project," defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical

5

change in the environment." (Pub. Resources Code, § 21065; *Tomlinson*, at p. 286.) Second, the agency decides whether it is exempt from compliance with CEQA under a statutory exemption or a categorical exemption set forth in the applicable regulations. (Pub. Resources Code, §§ 21080, 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300; *Tomlinson*, at p. 286.)

If the project is not exempt, the agency must engage in the third step and determine whether it may have a significant effect on the environment. If the answer is no, it must adopt a negative declaration or mitigated negative declaration to that effect; if the answer is yes, an EIR must be prepared before approval of the project. (Pub. Resources Code, §§ 21100, subd. (a), 21151, subd. (a); *Tomlinson*, *supra*, 54 Cal.4th at p. 286.) When economic, social, or other conditions make alternatives or mitigation measures infeasible, a project may be approved in spite of significant environmental damage if the agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage. (Pub. Resources Code, §§ 21002, 21002.1, subd. (c); Cal. Code Regs., tit. 14, § 15093.)

The decision to certify an EIR and approve a project may be judicially challenged by a petition for writ of mandate. (Pub. Resources Code, §§ 21168, 21168.5.) A petitioner with no direct beneficial interest in the proceeding has standing to proceed " 'where the question is one of public right and the object of the action is to enforce a public duty—in which case it is sufficient that the plaintiff be interested as a citizen in having the laws executed and the public duty enforced.' " (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 913-914.)

## II. FACTS AND PROCEDURAL HISTORY

### A. The Line

The Northwest Pacific Railroad line (the line) is located on California's north coast and is viewed as a single railroad extending from its northernmost point in the city of Arcata in Humboldt County to Lombard in Napa County in the south. Willits is the geographical center of the line, and the dividing point between the Northern or Eel River

Division and the Southern or Russian River Division. An interchange in Lombard connects the line to the national railroad system.

B. NCRA

In 1989, the California Legislature created NCRA to maintain rail service on the line. (Gov. Code, § 93000 et seq.) A government agency with a board composed in part of representatives from the counties and cities it serves (Gov. Code, § 93011), NCRA has the statutory authority to operate railroads, acquire the rights to property necessary to operate and maintain railroads, issue bonds, accept loans and grants from other agencies, and select a private operator to run the railroad system within its area of jurisdiction. (Gov. Code, § 93020.) Over the course of several years, NCRA acquired title or easement rights over the entire line, and it operated freight service on the line between 1992 and 1998. A portion of the track in the Russian River Division is owned by the Sonoma-Marin Area Rail Transit District (SMART), whose predecessor granted NCRA an easement.

C. Safety Issues, Environmental Issues and Closure of the Line

The line has a history of safety and maintenance issues, and sections were closed to passenger service as early as 1990. After the El Niño storms of 1998, the Federal Railroad Administration issued Emergency Order No. 21, closing the entire line. Limited operations eventually resumed over 41 miles of track near Petaluma, but track repairs, maintenance and upgrades were required before the line could reopen.

In 1999, after NCRA was sued by various state and local agencies regarding environmental and safety issues along the line, it entered into a consent decree and stipulated judgment requiring it to remediate certain conditions.

D. TCRP Funds

The California Legislature in 2000 adopted the Transportation Congestion Relief Program (TCRP), creating a state treasury fund for a number of specified projects designed "to relieve traffic congestion, provide additional funding for local street and road deferred maintenance, and provide additional transportation capacity in high growth

7

areas of the state." (Gov. Code, § 14556.6; see Gov. Code, §§ 14556, 14556.3, 14556.5, 14556.40.) To obtain TCRP funds, the "lead applicant agency" for a particular project must submit an application in accordance with guidelines adopted by the California Department of Transportation (Caltrans). (Gov. Code, §§ 14556.10, 14556.1, subd. (a).) A total of $60 million was allocated for the repair and upgrade of tracks on the line, with NCRA being the "lead applicant" for those funds. (Gov. Code, § 14556.40, subd. (a)(32).)[2]

NCRA and Caltrans executed a written master agreement, which governed the process for obtaining TCRP funds. Section O of the master agreement, entitled "Environmental Process," provides: "Completion of the environmental process ("clearance") for PROJECT by RECIPIENT (and/or STATE if it affects a STATE facility within the meaning of the applicable statutes) is required prior to requesting PROJECT funds for right-of-way purchase or construction. No STATE agency shall request funds nor shall any STATE agency, board or commission authorize expenditures of funds for any PROJECT effort, except for feasibility or planning studies, which may have a significant effect on the environment unless such request is accompanied by an environmental impact report per mandated by the California Environmental Quality Act (CEQA). California Public Resources Code Section 21080(b)(10), does provide an exemption for passenger rail PROJECT which institutes or increases passenger or commuter services on rail or highway rights-of-way already in use." The master agreement also requires approval by the California Transportation Commission (CTC) before appropriated funds can be distributed.

---

[2] This amount includes $1 million to defray NCRA's administrative costs, $600,000 to fund completion of the rail line from Lombard to Willits, $1 million to fund the completion of the line from Willits to Arcata, $5 million to upgrade the line to Class II or III status, $4.1 million for environmental remediation projects, $10 million for NCRA's debt reduction, $1.8 million for local match funds, $5.5 million for repayment of federal loan obligations and $31 million for "long-term stabilization projects." (Gov. Code, § 14556.50.)

8

In 2002, NCRA prepared a project funding plan, a strategic plan and a capital assessment report at the request of CTC. The capital assessment report discussed the environmental review contemplated in connection with repairs and improvements to the line, which included compliance with CEQA and the preparation of an EIR.

E. NWPRC

In January 2006, anticipating repairs would be made to the line, NCRA published a request for proposals seeking a private operator.[3] It selected NWPRC to become the operator for the line, and in September 2006, the two parties executed an operations agreement. The operations agreement was expressly conditioned on "NCRA having complied with [CEQA] as it may apply to this transaction."

NWPRC was approved as an operator after filing a notice of exemption under 49 Code of Federal Regulations section 1150.31, subdivision (a)(3), which allows the STB to exempt a change in operators on a line from the certification that is otherwise required. Two parties, Mendocino Railway and FOER, challenged the exemption and urged the STB to conduct a full environmental review before approving the change in operators. The STB rejected these challenges, a ruling apparently not challenged in an appeal to the federal court of appeals.

F. Application for Release of TCRP Funds; Contemplated Environmental Review

In November 2006, NCRA filed an application with CTC seeking the release of $31 million in TCRP funds for upgrades and repairs to the Russian River Division of the line, which would enable the line to reopen between Lombard and Windsor. The application stated, "Once an Initial Study is completed, appropriate CEQA and NEPA documentation will be prepared," and defined the project's scope to include "a variety of environmental studies, reviews, assessments and preparation of reports to support the CEQA/NEPA review process." The project description for purposes of CEQA and

---

[3] NCRA had previously entered into an agreement with Northwestern Pacific Railway Company, LLC (NWPC) to operate freight over the line. The STB approved NWPC as the operator in 2001, but NWPC had financial problems and ceased operations later that year.

9

NEPA was expected to be the reopening of the entire Russian River Division from Lombard to Willits.

The state approved NCRA's first "program supplement" in January 2007 and released a total of $6,826,000, which included $2,129,000 for project approval and environmental documents for the Russian River Division, $3,300,000 for an EIR on impacts to the Eel River Canyon, and $1,397,000 for project specifications and estimates. A subsequent allocation of $1,530,000 was approved in March 2007, under which the scope of work was modified to eliminate NEPA review, the reason being that environmental review would proceed under CEQA instead.

NCRA submitted a strategic plan update in February 2007, describing its plan for the opening of the entire line as follows: "NCRA has adopted a policy of reopening the entire Northwestern Pacific Railroad Line from Lombard to Arcata/Samoa. Reopening the entire line is currently estimated to cost between $151 million and $500 million depending on the volume of traffic and the level and timing of repair. [¶] The first phase of construction has been identified as the Russian River Division Phase 1 from Lombard to Windsor based on the market demand for rail service, the existing condition of the line, the ability to team with SMART, and the ability to work within NCRA's right-of-way to restore a prior-existing service. [¶] Future construction phasing will be based on several factors including market demand for rail, environmental clearance, and availability of funding. However, the current plan, once the Russian River Division Phase 1 is completed, is to move forward with the Russian River Division Phase 2 [to Willits], then the [Eel River] Canyon [north of Willits], and finally the North-End." The update stated "the processing of the EIR/EIS document and associated preliminary engineering is the critical path to reopening NCRA's rail line from Willits north. Due primarily to the nature of the project, the complexities of the processes, and the extent of public disagreements as to the physical effects of the proposed project, NCRA, as lead agency, proposes to prepare and process a combined document (CEQA/NEPA) that involves facility upgrades, landslide stabilization and reopening of the line from Willits to South Fork." NCRA indicated it would be issuing a categorical exemption from CEQA for

repair work within the existing right-of-way in the Russian River Division, and would begin an EIR under CEQA to review the impact of freight operations within the Russian River Division.

G. Initial Study; Notices of Exemption

In May and July 2007, NCRA issued initial studies under CEQA concerning freight operations in the Russian River Division, which concluded an EIR was required. NCRA issued notices of exemption for rail line reconstruction work in the Russian River Division regarding work NCRA believed to be categorically exempt from environmental review under CEQA.[4] (Cal. Code Regs., tit. 14, §§ 15301-15305, 15308, 15309, 15311, 15321, 15330.) One of the notices stated the proposed action would be "limited to the repair, restoration, replacement-in-kind, or retrofitting, as well as the on-going maintenance of existing railroad facilities. All of the identified repairs and maintenance activities will be limited to within the existing NCRA right-of-[way], throughout the project corridor, and will not involve any expansion of existing use and will not change the purpose or capacity of the structures being repaired."

H. Lawsuit with City of Novato; Consent Decree

NCRA's notices of exemption were challenged by the City of Novato, which filed a petition for writ of mandate alleging NCRA had failed to comply with CEQA and had improperly segmented the reconstruction project to minimize its overall impacts. (*City of Novato v. North Coast Railroad Authority* (Super. Ct. Marin County, 2007, No. CV074645) (*City of Novato*).) The parties settled the case in November 2008, with the court entering a consent decree and stipulated judgment requiring NCRA to perform certain work and to comply with CEQA and/or NEPA with respect to that work.

---

[4] NCRA noted the repairs to the tracks were subject to the exclusive jurisdiction of the STB, but "this [categorical exemption] determination has been prepared to demonstrate that the Proposed Action would be exempt from [CEQA] regardless of the STB jurisdiction over the freight activities."

I. Release of Additional TCRP Funds

In May 2010, the CTC approved NCRA's request for an additional $7,495,000 in TCRP funds. The CTC resolution approving the funds noted NCRA was producing an EIR for operations in the Russian River Division to "evaluate[ ] the impact of using the rail line for freight operations."

J. Draft and Final EIR

In March 2009, NCRA issued a draft EIR for the resumption of freight rail operations in the Russian River Division. After a period of public comment and the preparation of a revised draft EIR in November 2009, NCRA issued a final EIR on March 23, 2011.

K. Resolution Certifying EIR and Approving Rail Operations

On June 20, 2011, NCRA adopted Resolution No. 2011-02, which certified the EIR, adopted a statement of overriding considerations and approved a project "resuming freight rail service from Willits to Lombard in the Russian River Division." The resolution contemplated the freight service would initially have three round-trip trains per week with each one having an estimate of 15 cars, increasing to up to three round-trip trains per day, six days a week, with an estimate of 25 cars on one round-trip and 60 cars on the other two round-trips. It also contemplated rehabilitation, construction and repair activities in four areas of the line.

Following the adoption of Resolution No. 2011-02, NCRA and NWPRC executed an amendment to their operations agreement stating the condition relating to compliance with CEQA had been deemed satisfied. The Federal Railroad Administration lifted Emergency Order No. 21 in May 2011, and NWPRC has been operating on the line since June 2011.

L. Petitions for Writ of Mandate

On July 20, 2011, FOER and CAT filed petitions for writ of mandate challenging NCRA's certification of the EIR and seeking to halt railroad operations pending additional CEQA review. The petitions, which named NCRA as respondent and

12

NWPRC as a real party in interest,[5] alleged the EIR was insufficient because, among other things, (1) it did not adequately describe the project, (2) it failed to disclose all of the work needed to rehabilitate the line, (3) it improperly segmented the impacts of opening of the Russian River Division from the impacts on the Eel River Division, (4) it did not identify existing environmental contamination, (5) it did not disclose the cumulative impacts of the project, and (6) it failed to adequately discuss feasible alternatives to the project.

### M.  Removal to Federal Court and Remand

NWPRC removed the cases to federal court, asserting the CEQA claims were preempted by the ICCTA and thus presented a substantial federal question.  The federal court remanded the cases to state court, concluding they were not *completely* preempted by the ICCTA because the ICCTA did not provide an exclusive substitute cause of action for the CEQA claims.  (See *Fayard v. Northeast Vehicle Services, LLC* (1st Cir. 2005) 533 F.3d 42, 47.)  The remand order distinguished the "complete preemption" required for federal question subject-matter jurisdiction from the claim that ICCTA preemption was a defense to the CEQA claims, this so-called defense preemption being an issue "for the state court to decide upon remand."

### N.  Demurrer

NWPRC, joined by NCRA, filed demurrers to the petitions on the ground the CEQA claims were preempted by the ICCTA.  Petitioners opposed the demurrers, arguing NCRA had voluntarily agreed to comply with CEQA as a part of the consent decree in the *City of Novato* case and as a condition of receiving TCRP funds from the State of California, and was estopped by its previous actions from asserting federal preemption.

The trial court (Judge Faye D'Opal) overruled the demurrers.  In its written ruling, the court agreed the ICCTA preempted the application of CEQA to the reopening of rail

---

    [5]  SMART was initially named as a real party in interest but was dismissed from the action and is not a participant in this appeal.

13

service on the Russian River Division, and further concluded petitioners lacked standing to assert any breach of contract by NCRA with respect to the consent decree or agreements related to the receipt of TCRP funds.  But it concluded NCRA and NWPRC were judicially estopped from claiming federal preemption as a defense due to positions previously taken.

O.  Resolution Rescinding Certification of EIR

On April 10, 2013, NCRA passed a resolution rescinding Resolution No. 2011-02 "to clarify that the NCRA did not have before it a 'project' as that term is used in [CEQA] and did not approve a project when it certified the EIR that was the subject of the Resolution."  The recitations supporting the 2013 resolution explained NCRA had "mistakenly, but in good faith, believe[d] that it needed to complete the environmental impact report for resumed operations," but that during the preparation of the administrative record for the mandate petitions "NCRA staff reviewed and evaluated NCRA's statutory authority for conducting operations on the line, including NCRA's legislative mandate to operate the line, STB approvals and authority, the Federal Railroad Administration's imposition and lifting of Emergency Order No. 21, the ICCTA and its express preemption of state regulation over railroad operations, and NCRA's lease with [NWPRC]."

The 2013 resolution stated in part, "After the STB approved [NWPRC]'s operation of the line in August 24, 2007, and subsequently rejected Mendocino Railway's and [FOER]'s challenges to that approval, no further action or approval was required by the STB as a condition to [NWPRC]'s right to operate the line," and "NCRA's preparation of the EIR, and continuing through the EIR process from 2007 through June 2011 was a valuable effort in that it identified potential environmental impacts of railroad operations, provided information to NCRA and the public about railroad operations, and examined ways that potentially significant effects could be mitigated, but certification of the EIR was not legally required as a condition to [NWPRC]'s legal right to operate the line."  The 2013 resolution further provided, "It is in the best interests of NCRA,

14

[NWPRC], the shippers that depend upon the continued rail operations on the line, and is consistent with the ICCTA's preemption of state regulation over railroad operations, as well as NCRA's legislative mandate to ensure that ongoing railroad operations continue, for NCRA to take whatever reasonable action will ensure the ongoing operation of the line."

P. Order Denying Petitions for Writ of Mandate

The case proceeded to a contested hearing before a different judge (Judge Roy O. Chernus). NCRA filed a motion to dismiss the writ petitions as moot based on the 2013 resolution rescinding certification of the EIR.

On May 10, 2013, the court issued a written order denying the petitions for writ of mandate. It concluded the petitions had not been mooted by the subsequent resolution rescinding the certification of the EIR because NCRA had not abandoned the project and had not rescinded "approval" of the project. But, on the merits, the ICCTA preempted the CEQA claims asserted by petitioners. As nonparties to the consent decree or TCRP master agreement, those parties lacked standing to enforce any voluntary agreement by NCRA to comply with CEQA.

The court "reconsider[ed] and revers[ed]" the prior order overruling the demurrers of NCRA and NWPRC based on the doctrine of judicial estoppel, because no admissible evidence had been presented to show NCRA had taken a position inconsistent with its preemption claim during a judicial or quasi-judicial proceeding. "Although the evidence in the Administrative Record shows: CEQA compliance was made an express condition of the Master Transportation Funding Agreement and Supplement[al] Funding Applications between the [CTC] and NCRA, and the Operations Lease Agreement between NCRA and [NWPRC]; and the fact NCRA received over $2 million from CTC to prepare the EIRs that are the subject of this lawsuit, [NCRA's and NWPRC's] express and tacit agreements to comply with CEQA as a condition of resuming freight rail service in the Russian River Division was not a position that was adopted or approved by any judicial or quasi-judicial tribunal. [¶] The principal purpose of the judicial estoppel

15

doctrine—i.e., to protect the integrity of the judicial process—is therefore not implicated here." The court rejected petitioners' argument the consent decree in the *City of Novato* litigation operated as judicial estoppel, reasoning it required CEQA compliance only with respect to construction activities within Novato and was limited in effect to that prior lawsuit.

Petitioners appeal, arguing their CEQA claims are not preempted by the ICCTA, judicial estoppel precludes NCRA and NWPRC from asserting as much, and the EIR was inadequate for reasons previously noted. NCRA and NWPRC repeat their claim this case was mooted by the 2013 resolution, but argue that on the merits, federal law preempts CEQA.

### III. DISCUSSION

#### A. *Mootness*

A case becomes moot and must ordinarily be dismissed "when a court ruling can have no practical impact or cannot provide the parties with effective relief." (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503; see *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573.) NCRA and NWPRC argue this case is moot because the petitions for writ of mandate challenged the sufficiency of the EIR certified by resolution in 2011, and NCRA has since rescinded that resolution. They suggest that because the railroad line is operating, and because no further approval is needed for those operations, this court lacks the ability to issue an order affecting railroad operations or the environmental review for those operations. We disagree.

Though the resolution approving the EIR has been rescinded, there is no evidence the project it approved has been abandoned. (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [writ of mandate challenging EIR not rendered moot when city vacated approval of resolution certifying EIR, but there was no evidence project was abandoned].) The mootness argument assumes CEQA is preempted by federal law and cannot be the basis for enjoining railroad operations or requiring further environmental review under its provisions. While we agree with this ultimate

16

conclusion, this does not obviate the need to address the preemption argument on its merits. If, after all, CEQA were not preempted, we would surely be empowered to grant the petitioners relief.

### B. *ICCTA Preempts CEQA As Applied to Railroad Operations*

#### 1. General Preemption Principles: ICCTA and CEQA

We first consider whether the ICCTA generally preempts CEQA's application to a project involving railroad operations. This is a pure question of law subject to de novo review. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.) Though it appears to be an issue of first impression in California, we are guided by federal cases and the administrative decisions of the STB itself, which have found preemption in circumstances similar to those before us.

The doctrine of preemption gives force to the supremacy clause of the United States Constitution. (U.S. Const., art. VI, cl. 2; *Burlington Northern*, *supra*, 209 Cal.App.4th at p. 1521.) Courts have recognized three types of preemption: express preemption, conflict preemption and field preemption. (*Burlington Northern*, at p. 1521.) When construing a federal provision that expressly preempts state law, we look first to its plain language, but also consider its context to determine congressional intent. (See *id*. at pp. 1521-1522.)

When Congress has legislated in a field the states have traditionally occupied, we " 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485; see *People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777-778.) This "presumption against preemption" does not apply when the state regulates an area in which there has been " 'a history of significant federal presence,' " such as rail transportation. (*Norfolk Southern Ry. Co. v. City of Alexandria* (4th Cir. 2010) 608 F.3d 150, 160, fn. 12, citing *United States v. Locke* (2000) 529 U.S. 89, 108; *CSX Transp., Inc. v. Williams* (D.C. Cir. 2005) 406 F.3d 667, 673 ["the case for preemption is particularly

17

strong" regarding rail transportation].) " 'Railroads have been subject to comprehensive federal regulation for nearly a century. . . . There is no comparable history of longstanding state regulation . . . of the railroad industry.' " (*Scheiding v. General Motors Corp.* (2000) 22 Cal.4th 471, 481; see *Frastaci v. Vapor Corp.* (2007) 158 Cal.App.4th 1389, 1398-1399 [state tort claims against locomotive manufacturer by survivors of railroad worker who died of asbestos-related mesothelioma were preempted by federal Locomotive Boiler Inspection Act].) We apply no presumption for or against preemption.

The ICCTA includes a "broadly worded express preemption provision" (*Burlington Northern*, *supra*, 209 Cal.App.4th at p. 1517): " 'The jurisdiction of the [STB] over—[¶] (1) transportation by rail carriers, and the remedies provided in this part [(49 U.S.C. § 10101 et seq.)] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and [¶] (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, [¶] is exclusive. Except as otherwise provided in this part, *the remedies provided under this part* [(49 U.S.C. § 10101 et seq.)] *with respect to regulation of rail transportation are exclusive* and preempt the remedies provided under Federal or State law.' (49 U.S.C. § 10501(b), italics added.)"

In light of this expansive language, "[t]he ICCTA 'preempts all "state laws that may reasonably be said to have the effect of managing or governing rail transportation." ' " (*Burlington Northern*, *supra*, 209 Cal.App.4th at p. 1528.) Two categories of state and local action are categorically preempted regardless of the context of the action: (1) any form of permitting or preclearance that, by its nature, could be used to deny a railroad the opportunity to conduct operations or proceed with other activities the STB has authorized; and (2) state or local regulation of matters directly regulated by the STB, such as the construction and operation of railroad lines. (*Ibid.*) Additionally, state actions that do not fall within one of these categories may be preempted as applied

18

when they "would have the effect of preventing or unreasonably interfering with railroad transportation." (*Adrian & Blissfield R. Co. v. Village of Blissfield* (6th Cir. 2008) 550 F.3d 533, 540 (*Adrian*).)

On the other hand, state laws are not preempted by the ICCTA when they have " ' "a more remote or incidental effect on rail transportation." ' " (*Burlington Northern, supra,* 209 Cal.App.4th at p. 1528.) The ICCTA "does not preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce. [Citations.] For instance, the STB has recognized that [the] ICCTA likely would not preempt local laws that prohibit the dumping of harmful substances or wastes, because such a generally applicable regulation would not constitute an unreasonable burden on interstate commerce. [Citations.]" (*Association of American Railroads v. South Coast Air Quality Mgmt. Dist.* (9th Cir. 2010) 622 F.3d 1094, 1097 (*Association of American Railroads*).)

In *City of Auburn v. U.S. Government* (9th Cir. 1998) 154 F.3d 1025, 1027-1031 (*Auburn*), the court concluded the ICCTA preempted state and local environmental permitting laws with respect to a railroad's efforts to reacquire a portion of a line and reestablish it as a main route in the Pacific Northwest. Rejecting a municipality's argument that the permitting requirements were " 'not economic regulations, but rather "essential local police power required to protect the health and safety of citizens" ' " (*id.* at p. 1029), the court reasoned: (1) Congress and the courts had long recognized the need to regulate rail operations at the federal level; (2) the plain language of the ICCTA granted the STB exclusive authority over projects like the one at issue; (3) nothing in the case law supported the claim that only *economic* regulation was preempted; and (4) there was no evidence Congress intended a state role in the regulation of railroads. (*Id.* at pp. 1029-1031.) "[I]f local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." (*Id.* at p. 1031.)

Similarly, in *Green Mountain R.R. Corp. v. Vermont* (2d Cir 1995) 404 F.3d 638, 640, 644 (*Green Mountain*), the court held the ICCTA preempted a state's efforts to condition a railroad operator's construction of new facilities on compliance with a state environmental land use statute requiring preconstruction permits. Rejecting the state's proposed distinction between economic and environmental regulations, the court concluded the permitting process " 'necessarily interfere[s]' " with the railroad operator's " 'ability to construct facilities and conduct economic activities.' " (*Id*. at p. 645; see *Association of American Railroads*, *supra*, 622 F.3d at p. 1097 [local regulations limiting permissible amount of emissions from idling trains and imposing reporting requirements on rail yards were preempted by ICCTA because they "may reasonably be said to have the effect of managing or governing rail transportation"]; *Vill. of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp.* (2000) 163 N.J. 446, 750 A.2d 57, 64 [state and local regulation "must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce"].)

The STB "has likewise ruled that 'state and local permitting or preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce.' " (*Green Mountain*, *supra*, 404 F.3d at p. 642, and decisions cited therein; see *Cities of Auburn and Kent, WA—Petition for Declaratory Order—Burlington Northern Railroad Company—Stampede Pass Line* (STB, July 1, 1997, No. FD 33200) 1997 STB Lexis 143, pp. **5-6.) When considering the environmental regulations applicable to a proposed high-speed rail project running from Nevada to California, the STB ruled "state permitting and land use requirements that would apply to non-rail projects, such as [CEQA], will be preempted." (*DesertXpress Enterprises, LLC—Petition for Declaratory Order* (STB, June 25, 2007, No. FD 34914) 2007 STB Lexis 343, p. *3.)

The decisions of lower federal courts, though not binding on us, are persuasive when they decide a question of federal law in a uniform way. (*Landstar Global Logistics, Inc. v. Robinson & Robinson, Inc.* (2013) 216 Cal.App.4th 378, 389.) The decisions of the STB regarding preemption, though not binding on this court, have been

20

accorded deference by the federal courts. (*DHX, Inc. v. Surface Transp. Bd.* (9th Cir. 2007) 501 F.3d 1080, 1086; *Association of American Railroads*, *supra*, 622 F.3d at p. 1097; *B & S Holdings, LLC v. BNSF Ry. Co.* (E.D.Wash. 2012) 889 F.Supp.2d 1252, 1257; but see *Franks Inv. Co. LLC v. Union Pacific R. Co.* (5th Cir. 2010) 593 F.3d 404, 413, citing *Wyeth v. Levine* (2009) 555 U.S. 555, 577 [agency has ability to make informed decision as to how state requirements impose obstacle to federal law it interprets, but weight accorded to agency's explanation of state law on federal scheme depends on its thoroughness, consistency and persuasiveness].) The authorities cited *ante* conclude a state statute requiring environmental review as a condition to railroad operations is preempted by the ICCTA, and we have been directed to no federal appellate or STB decision reaching a contrary conclusion. We find the decisions persuasive and fully applicable to the case before us.

Subject to certain exceptions, CEQA requires a state or local agency to prepare and certify an EIR before it carries out or approves a "project" that may have significant direct or indirect environmental impacts. (Pub. Resources Code, §§ 21100, 21151.) The preparation of an EIR is an "often lengthy and expensive process" (*City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 63) designed to inform the public and local agencies about the environmental consequences of a project so they may consider those consequences before acting. (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 695.) Though CEQA does not mandate the disapproval of a project with significant environmental effects (*ibid.*), an agency must mitigate or avoid the significant environmental effects of a project if it is feasible to do so. (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 336.) An EIR's disclosure of such effects could significantly delay or even halt a project in some circumstances, and in the context of railroad operations, CEQA is not simply a health and safety regulation imposing an incidental burden on interstate commerce.

As the trial judge in this case aptly noted, "CEQA mandates a time consuming review which may result in indefinite delays and unduly interfere with exclusive federal

21

jurisdiction over rail transportation by giving state or local officials the ability to withhold approval for a [p]roject because the EIR and/or the lead agency's findings fail to comply with one or more of the CEQA conditions."  While CEQA serves a laudable and important purpose, " '[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.' [Citations.]" (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153.)

Petitioners suggest CEQA could not interfere with the STB's authority under the ICCTA because the work at issue in this case involved the rehabilitation, repair and maintenance of existing tracks, and the STB "lacks jurisdiction" over those matters.  In the case on which they rely for this proposition, *Lee's Summit, Missouri v. Surface Transportation Board* (D.C. Cir. 2000) 231 F.3d 39, 40, 42, the court affirmed an STB decision authorizing the restoration of existing but unused tracks and finding no environmental review was required.  That certain work is exempt from federal environmental review and certification by the STB does not mean state environmental review of such matters would not interfere with railroad operations.  Petitioners' CEQA claims fall within the preemption clause of the ICCTA.

In concluding the ICCTA expressly preempts CEQA review of proposed railroad operations, we acknowledge the recent decision in *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314 (*Atherton*), in which the Third District Court of Appeal considered a similar issue:  Did the ICCTA preempt CEQA review by a state railroad authority for the purpose of determining which of two routes would be utilized in one section of a high-speed rail system?  The *Atherton* court recognized a local government's denial of a permit to operate a rail line would be preempted because it could be " ' "used to deny a railroad the ability to conduct some part of its operations or to proceed with activities the [STB] has authorized," ' " but indicated it was "less clear and certainly subject to dispute whether requiring review under CEQA before deciding on the alignment of [the rail line] has a comparable

22

potential effect to deny the railroad the ability to conduct its operations and activities."
(*Id*. at p. 333.)

The *Atherton* court did not decide whether the ICCTA preempted CEQA because it concluded the market participation doctrine operated as an exception to preemption under the circumstances of that case. (*Atherton*, *supra*, 228 Cal.App.4th at pp. 333-334.) We discuss *Atherton* and the market participation doctrine more fully *post*, but note for now that requiring a CEQA analysis as part of the process for determining *where* to place a rail line, which was at issue in *Atherton*, differs from requiring a CEQA analysis as a condition of resuming rail operations, at issue in the present case.

### 2.  Effect of NCRA's "Agreement" to Prepare EIR

Petitioners argue their claims are not preempted because NCRA voluntarily agreed to comply with CEQA as a condition of receiving TCRP funds for rehabilitating and upgrading the line. Thus, they argue, even if the ICCTA would otherwise preempt CEQA review of resumed operations in the Russian River Division, NCRA voluntarily agreed to prepare an EIR in order to receive TCRP funds from the state. (See *Service Employees Internat. Union, Local 99 v. Options—A Child Care & Human Services Agency* (2011) 200 Cal.App.4th 869, 879 (*SEIU*) [private agency, though not otherwise subject to the Ralph M. Brown Act (Brown Act; Gov. Code, § 54950 et seq.), agreed to comply with that law as condition of receiving public funds].)

In *PCS Phosphate Co., Inc. v. Norfolk Southern Corp.* (4th Cir. 2009) 559 F.3d 212, 218-219, the court concluded a landowner's lawsuit against a railroad for breach of contract and breach of the covenants under an easement granted to the railroad were not preempted by the ICCTA. "Voluntary agreements between private parties . . . are not presumptively regulatory acts, and we are doubtful that most private contracts constitute the sort of 'regulation' expressly preempted by the statute. If contracts were by definition 'regulation,' then enforcement of every contract with 'rail transportation' as its subject would be preempted as a state law remedy 'with respect to regulation of rail transportation.' 49 U.S.C. § 10501(b). . . . If enforcement of these agreements were

23

preempted, the contracting parties' only recourse would be the 'exclusive' ICCTA remedies. But the ICCTA does not include a general contract remedy. Such a broad reading of the preemption clause would make it virtually impossible to conduct business, and Congress surely would have spoken more clearly, and not used the word 'regulation,' if it intended that result." (*Ibid*., fns. omitted.)

The master agreement between NCRA and Caltrans provides, in relevant part, "Completion of the environmental process ("clearance") for PROJECT by RECIPIENT (and/or STATE if it affects a STATE facility within the meaning of the applicable statutes) is required prior to requesting PROJECT funds for right-of-way purchase or construction. No STATE agency shall request funds nor shall any STATE agency, board or commission authorize expenditures of funds for any PROJECT effort, except for feasibility or planning studies, which may have a significant effect on the environment unless such a request is accompanied by an environmental impact report per mandated by the California Environmental Quality Act (CEQA)." Additionally, NCRA stated it would be preparing an EIR in its supplemental requests to CTC for TCRP funds.

This language does not unambiguously amount to a commitment to prepare an EIR regarding the resumption of railroad operations on the Russian River Division. It states that environmental clearance is required before funds may be requested for the purchase or construction of rights-of-way, and that no TCRP funds will be authorized or approved for a project that may have a significant effect on the environment unless an EIR is prepared "per mandated by" CEQA. Here, the purchase or construction of a right-of-way is not at issue, and the TCRP funds at issue were dispersed for repair work, not rail operations per se. Moreover, in a case in which CEQA is preempted by federal law, an EIR would not be "mandated by" CEQA, rendering the language of the master agreement ambiguous if it is read to encompass railroad operations.

More fundamentally, even if the master agreement is viewed as a contract requiring the preparation of an EIR regarding resumed railroad operations, a claim based on a breach of that obligation may only be enforced by a party having standing. (See *Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2009) 109 Cal.App.4th

24

1162, 1173; *Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027, 1034.) Subject to an exception not relevant here, "[i]n asserting a claim based upon a contract, this generally requires the party to be a signatory to the contract, or to be an intended third party beneficiary." (*Berclain America Latina v. Baan Co.* (1999) 74 Cal.App.4th 401, 405; see Civ. Code, § 1559 ["A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it"].) Petitioners are not parties to NCRA's agreement with Caltrans, but argue they qualify as intended third party beneficiaries under the principles of *SEIU*, *supra*, 200 Cal.App.4th 869.

In *SEIU*, a nonprofit corporation entered into a contract with the state to provide childcare and education services within Los Angeles County. (*SEIU*, *supra*, 200 Cal.App.4th at p. 873.) As a private entity rather than a legislative body or local agency, it was not subject to the notice and open meeting requirements of the Brown Act, but it agreed to comply with the Brown Act in a provision of its contract with the state. (*Id.* at pp. 873, 879, 883-884.) Plaintiffs, who were members of the public, filed an action for violation of the Brown Act and breach of contract, alleging the nonprofit corporation's board of directors had not followed appropriate Brown Act procedures in holding a board meeting. (*Id.* at pp. 874-875.) In an appeal from an order granting summary judgment in favor of the nonprofit corporation, the Court of Appeal concluded (1) the contractual provision requiring compliance with the Brown Act was intended to benefit members of the public; (2) the plaintiffs (a union and its employee) were members of the public suing to enforce a public right and were, as such, intended beneficiaries under the contract between the nonprofit corporation and the state; (3) the plaintiffs could therefore sue on the contract as third party beneficiaries; however, (4) they could not sue directly under the Brown Act because the corporation was not an entity otherwise subject to the Brown Act. (*Id.* at pp. 878-884.)

Petitioners argue they have standing, analogizing their petitions for writ of mandate under CEQA with the claim for breach of contract in *SEIU*. They note CEQA, like the Brown Act, was designed to benefit members of the public, and compliance with

25

CEQA was a condition of NCRA's contract with the state. The decision in *SEIU* is distinguishable because in that case the plaintiffs had included a cause of action for breach of contract. No such claim has been asserted by petitioners, who have not even alleged the existence of a contractual agreement by NCRA to prepare an EIR. The *SEIU* court concluded the direct cause of action under the Brown Act could not be sustained because the defendant was a private corporation to which the Brown Act did not apply. (*SEIU*, *supra*, 200 Cal.App.4th at pp. 883-884.) Similarly, the contract between the state and NCRA does not confer a direct statutory right to sue under CEQA because CEQA is preempted by federal law.[6]

Petitioners argue they do not need to rely on a third party beneficiary theory because they have a statutory right as members of the public to challenge an EIR required by CEQA, and a petition for writ of mandate is the appropriate procedural vehicle for requiring a public agency to do what it is legally obligated to do. (See *Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 847 [contractually based civil claims against public employer treated as action for ordinary mandamus for purposes of appellate review because they were "no more than challenges to the administrative decision of a state agency"].) We disagree. CEQA is preempted by federal law when the project to be approved involves railroad operations. This means the remedies under CEQA, including the right to petition for a writ of mandate, are preempted. Because it is the contractual agreement with the state that purportedly obligates NCRA to comply with CEQA, the only way petitioners can proceed is via an action to enforce that contract. Petitioners have not brought an action to enforce the contract. (See *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 52 ["As a general proposition,

_____

[6] At oral argument, petitioners suggested for the first time on appeal that we remand the case to allow them to amend their pleadings to include a third party beneficiary theory. We decline to do so. In *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970-972, the decision on which petitioners rely in support of this request, the state Supreme Court concluded a demurrer should have been sustained with leave to amend so the cross-complainant could attempt to plead a breach of contract under a third party beneficiary theory of liability. This case has proceeded well beyond the pleadings stage.

26

mandamus is not an appropriate remedy for enforcing a contractual obligation against a public entity"]; *Wenzler v. Municipal Court* (1965) 235 Cal.App.2d 128, 132 [same].)

The difference between a petition for writ of mandate under CEQA and a claim for breach of contract under a third party beneficiary theory is not merely a semantic one. In reviewing the adequacy of an EIR certified by an agency, courts apply a standard of traditional mandamus and "the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259.) In a claim for specific performance of a contract under a third party beneficiary theory, a plaintiff must prove both the existence of a contract and a breach of its terms. (See *Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949, 959-960 [third party beneficiary's right to sue for specific performance]; *Mansouri v. Superior Court* (2010) 181 Cal.App.4th 633, 642 [elements of specific performance].)

As already noted, the master agreement signed by NCRA and Caltrans does not unambiguously require an EIR for railroad operations in cases where CEQA is preempted. And, in any event, NCRA did prepare an EIR. A claim for breach of contract would present a number of factual issues that simply have no role in the litigation of a petition for writ of mandate under CEQA: Should the master agreement be construed to require an EIR? Did NCRA's preparation of an EIR satisfy this condition? Petitioners ask us to *assume* the breach of contract, which would in turn confer standing to proceed on the CEQA claim, when in actuality they have skipped the essential step of alleging and proving a breach of contract by a preponderance of the evidence. (Cf. *Buxbom v. Smith* (1944) 23 Cal.2d 535, 542-546 [pleadings and evidence supported damages based on tortious interference with plaintiff's business, though the only cause of action alleged was for breach of contract].)

### 3. "Market Participation" Doctrine

" '[W]hen government agencies are acting in their capacity as the owners of property or purchasers of goods and services, they are not making policy or acting as regulators and largely have the same freedom to protect their interests as do private individuals and entities.' " (*Associated General Contractors of America v. San Diego Unified School Dist.* (2011) 195 Cal.App.4th 748, 757 (*Associated Contractors*).) Petitioners argue their CEQA claims are not preempted by the ICCTA because NCRA was acting as a market participant rather than a regulator when it prepared the EIR. Petitioners rely heavily on the recent decision in *Atherton*, which applied the market participation doctrine to the preparation of an EIR by a state agency charged with planning a high-speed rail system in California, and consequently rejected a claim by that agency that CEQA review was preempted by the ICCTA. (*Atherton*, *supra*, 228 Cal.App.4th at pp. 333-334.) We are not persuaded the market participation doctrine applies.

The market participation doctrine originated in a series of dormant Commerce Clause cases. (*Engine Manufacturers Assn. v. SCAQMD* (9th Cir. 2007) 498 F.3d 1031, 1040 (*Engine Manufacturers*).) In *Hughes v. Alexandria Scrap Corp.* (1976) 426 U.S. 794, 805-806, the court rejected a Commerce Clause challenge to a Maryland law imposing extra documentation requirements for out-of-state processors of scrap metal participating in a program offering a "bounty" for every junk car converted into scrap, concluding Maryland had not acted as regulator, but had "entered into the market itself to bid up" the price of the junk cars. In *Reeves, Inc. v. Stake* (1980) 447 U.S. 429, 432-433 (*Reeves*), an out-of-state buyer challenged a policy of the state of South Dakota that gave preference to residents seeking to purchase cement produced at a state-owned plant. The court rejected a claim this policy violated the Commerce Clause, because the state was acting as a market participant rather than a market regulator: "[S]tate proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, States

28

should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." (*Id*. at p. 439.)

The Supreme Court later extended the market participation doctrine to protect proprietary state action from preemption under various federal statutes, recognizing that federal preemption applies "only to state regulation." (*Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.* (1993) 507 U.S. 218, 227 (*Boston Harbor*); see *Engine Manufacturers*, *supra*, 498 F.3d at p. 1040.) In *Boston Harbor*, *supra*, 507 U.S. at pp. 222-223, a labor organization representing nonunion construction industry workers sought to enjoin enforcement of a state agency's bid specification that required successful bidders on a construction project it owned to abide by a collective bargaining agreement. The court rejected the argument the bid specification was preempted by the National Labor Relations Act (NLRA): "A State does not regulate, however, simply by acting within one of these protected areas. When a state owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*." (*Id.* at p. 227.)

"In distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power, the key under *Boston Harbor* is to focus on two questions. First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem? Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out." (*Cardinal Towing v. City of Bedford, Texas* (5th Cir. 1999) 180 F.3d 686, 693 (*Cardinal Towing*) [city's bid specifications for tow truck company not preempted by Federal Aviation Administration Authorization Act].)

29

While proprietary actions taken by a state generally will not be preempted by federal law, "the market participation doctrine is not a wholly freestanding doctrine, but rather a presumption about congressional intent." (*Engine Manufacturers*, *supra*, 498 F.3d at p. 1042.) "Because congressional intent is the key to preemption analysis, we must consider whether [a federal law] contains 'any express or implied indication by Congress' that the presumption embodied by the market participant doctrine should not apply to preemption under the Act." (*Ibid*., citing *Boston Harbor*, *supra*, 507 U.S. at p. 231.) In a market participation case, the court undertakes "a single inquiry: whether the challenged 'program constituted direct participation in the market.' " (*Reeves, supra*, 447 U.S. at p. 435, fn. 7.)

State action designed to protect the environment may be proprietary in nature and thus exempt from preemption by a federal environmental statute. In *Engine Manufacturers*, *supra*, 498 F.3d 1031, a state agency charged with air pollution control in Southern California established fleet rules directing state and local governments to choose vehicles that met certain emission standards or contained alternative-fuel engines. (*Id.* at pp. 1037-1039.) A trade association representing manufacturers of diesel-fueled engines challenged those rules as preempted by the federal Clean Air Act. (*Id*. at pp. 1031, 1037-1039.) The court disagreed, concluding the acquisition of vehicles by state and local governments amounted to proprietary action because they " 'essentially reflect the [state] entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances.' " (*Id*. at p. 1045.) Rejecting an argument that the fleet rules were not concerned with the "efficient procurement" of services because their goal was to reduce pollution, the court noted, "That a state . . . may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine's application, so long as the action in question is the state's own market participation. . . . [¶] . . . 'Efficient' does not merely mean 'cheap.' In context, 'efficient procurement' means procurement that serves the state's purposes—which may include purposes other

30

than saving money—just as private entities serve their purposes by taking into account factors other than price in their procurement decisions." (*Id*. at p. 1046.)

In the case before us, NCRA, a political subdivision of the state, undertook a project to reopen the Russian River Division of the line. As part of that project, it prepared an EIR, which is now challenged by petitioners as inadequate. Even if the project to reopen the line is viewed as "proprietary" and the initial decision to prepare the EIR a component of this proprietary action, a writ proceeding by a private citizen's group challenging the adequacy of the review under CEQA is not a part of this proprietary action.

As the cases cited *ante* make clear, the market participation doctrine gives governmental entities the freedom to engage in conduct that would be allowed to private market participants. (*Associated Contractors*, *supra*, 195 Cal.App.4th at p. 757.) It accomplishes this end by allowing the governmental entity to avoid a charge by aggrieved third parties that its actions are preempted by federal law. (E.g., *Boston Harbor*, *supra*, 507 U.S. 218; *Engine Manufacturers*, *supra*, 498 F.3d 1031; *Cardinal Towing*, *supra*, 180 F.3d 686.) Thus, governmental entities whose activities were allegedly preempted used the market participation doctrine *defensively* against the nonunion labor organization in *Boston Harbor*, the unsuccessful bidder in *Cardinal Towing*, and the diesel-fuel engine manufacturers in *Engine Manufacturers*.

Petitioners seek to stand the market participation doctrine on its head and use it to avoid the preemptive effect of a federal statute the state entity is seeking to invoke. None of the cases involving market participation use the doctrine in this context, and such a use would be antithetical to the purpose underlying the doctrine. A private railroad that conducted a voluntary environmental review as part of a project would not be subjected to a challenge to that review by a private citizen's group. The aspect of CEQA that allows a citizen's group to challenge the adequacy of an EIR when CEQA compliance is required is clearly regulatory in nature, as a lawsuit against a governmental entity cannot be viewed as a part of its proprietary action, even if the lawsuit challenges that proprietary action.

31

The situation before us is akin to the so-called *Grupp* cases, in which third parties alleged a courier service had improperly billed state governments it had contracted with to provide services. (*State of New York ex rel. Grupp v. DHL Express (USA), Inc.* (2012) 19 N.Y.3d 278 (*Grupp III*); *State ex rel. Grupp v. DHL Express (USA), Inc.* (2011) 922 N.Y.S.2d. 888 (*Grupp II*); *DHL Express (USA), Inc. v. State ex rel. Grupp* (Fla.Dist.Ct.App. 2011) 60 So.3d 426 (*Grupp I*).) Although the third parties had standing to bring actions under the states' false claims acts, the claims were preempted by the Federal Aviation Administration Authorization Act. (*Grupp III*, 19 N.Y.3d at pp. 283-286; *Grupp II*, 922 N.Y.S.2d at pp. 890-891; *Grupp I*, 60 So.3d at pp. 427-429.) The third parties could not assert the market participation doctrine to avoid federal preemption because, while the state had procured the courier services in its proprietary capacity, the state false claims acts "establishe[d] public policy goals and [were] thus regulatory in nature." (*Grupp III*, 19 N.Y.3d at p. 286; see *Grupp II*, 922 N.Y.S.2d at p. 891; *Grupp I*, 60 So.3d at p. 429.)[7] "Although the State of Florida was a market participant when it contracted with DHL, it acts as a regulator in authorizing suits under the False Claims Act . . . . In the latter role, the state (and respondents on the state's behalf) is not a market participant." (*Grupp I*, 60 So.3d at p. 429.) These cases are significant because they recognize that when a party relies on a state law of general application to challenge a state proprietary action, that challenge operates as a regulation, rather than a part of the proprietary action being challenged.

We conclude the market participant doctrine may not be used to avoid federal preemption by the ICCTA in this case. We acknowledge a contrary conclusion on similar facts was reached by the court in *Atherton*, *supra*, 228 Cal.App.4th 314.

In *Atherton*, a state agency (the Authority) charged with planning a statewide high-speed rail line (HST) was faced with the question of where to lay the tracks between

---

[7] A similar suit was filed in California, and a Court of Appeal decision reaching the same result was recently granted review, apparently on grounds not relating to the market participation doctrine. (*Grupp v. DHL Express (USA), Inc.* (2014) 225 Cal.App.4th 510, review granted July 30, 2014, S218754.)

the Central Valley and the San Francisco Bay Area, the two choices being the Pacheco Pass or farther north through the Altamont Pass. (*Atherton*, *supra*, 228 Cal.App.4th at pp. 322-323.) The Authority prepared a number of CEQA documents in connection with this decision, believing the STB lacked jurisdiction over the intrastate project and CEQA applied. (*Id*. at pp. 324-326, 328.) After the Authority certified a final EIR and approved the Pacheco Pass alternative, environmental groups and local governments filed mandate petitions challenging the adequacy of the EIR. (*Id*. at pp. 324-327.) They received only a partial victory and filed an appeal (*id*. at pp. 326-327), during which time the STB issued a decision finding it did have jurisdiction over the line (*id*. at p. 328). After the Court of Appeal had calendared the case for oral argument, the Authority was granted permission to file supplemental briefs and asserted for the first time that CEQA review was preempted by the ICCTA. (*Id*. at pp. 328-329.)

The court in *Atherton* rejected the preemption argument, concluding the Authority had acted as a market participant and ICCTA preemption did not apply: "We are not faced with a private railroad company seeking to construct a rail line without having to comply with state regulations. Rather, it is the state that is constructing the rail line, financed by bonds which were approved by the state's electorate in Proposition 1A. (Sts. & Hy. Code, § 2704 et seq.) Proposition 1A, as we discuss *post*, included compliance with CEQA as a feature of the HST. The state created the Authority to direct development and implementation of the HST. (Pub. Util. Code, § 185030.) From at least 2000 until the present, the Authority has complied with CEQA with respect to planning the HST. It is these factors—state ownership of the HST, Proposition 1A, and years of the Authority's compliance with CEQA—that provide the basis for finding an exception to preemption under the market participation doctrine." (*Atherton*, *supra*, 228 Cal.App.4th at pp. 333-334.)

Although *Atherton* presents a situation factually and procedurally similar to the one before us, we respectfully disagree with the court's analysis, which overlooks the genesis and purpose of the market participation doctrine and does not adequately answer the question of how a third party's challenge to an EIR under CEQA can reasonably be

33

viewed as part of the government's proprietary activities. The *Atherton* court characterizes the Authority's compliance with CEQA as voluntary due to its longstanding practice of CEQA compliance and its acceptance of funds from a bond measure that contemplated such compliance, and concludes, " ' "[V]oluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce." [Citation.] ' " (*Atherton*, *supra*, 228 Cal.App.4th at p. 339.) Yet, elsewhere in the opinion, the court recognizes that when a state action imposes a permitting or preclearance requirement that could be used to deny a railroad the ability to conduct its operations, the governmental action is " ' "*per se* unreasonable interference with interstate commerce," [and] "the preemption analysis is addressed not to the reasonableness of the particular state or local action, but rather to the act of regulation itself." ' " (*Id*. at p. 330, citing *Adrian*, *supra*, 550 F.3d at p. 540.)

Additionally, characterizing a government agency's preparation of CEQA documents as "voluntary" does not answer the question of whether and when a third party has standing to enforce CEQA compliance. The court in *Atherton* suggests the bond measure funding the HST was akin to a contractual agreement between the public entity and the electorate, citing *Monette-Shaw v. San Francisco Board of Supervisors* (2006) 139 Cal.App.4th 1210, 1215. Assuming a member of the electorate could bring a breach of contract claim based on an entity's failure to comply with a bond measure under the circumstances of *Atherton* (see *Associated Students of North Peralta Community College v. Board of Trustees* (1979) 92 Cal.App.3d 672, 676), NCRA's alleged "voluntary" agreement to comply with CEQA arises from its contract with the state, not from its acceptance of funds from a bond measure. As we have previously explained, petitioners do not have standing to enforce that contract.

### 4. Consent Decree

Petitioners argue the consent decree in the *City of Novato* litigation amounted to an agreement by NCRA to produce an EIR. We disagree. The consent decree in this case did not purport to resolve all issues pertaining to the resumption of railroad

34

operations in the Russian River Division, and the scope of the work under that decree is not the same as that reviewed in the EIR prepared by NCRA. Though the consent decree states the work to be performed "shall be subject to CEQA and/or [NEPA]" and, "[i]n deciding whether to approve and undertake the performance of any and all components of the Work, NCRA shall comply with CEQA and or NEPA," the "Work" covered by the agreement was limited to certain construction activities rather than the resumption of rail operations. The consent decree cannot be read to confer a clear contractual obligation on NCRA to prepare an EIR for the reopening of the Russian River Division. Even if it did, petitioners, as nonparties, lack standing to enforce its provisions. (*Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 750 ["a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefitted by it"].)

### 5. Tenth Amendment; State Sovereignty

Petitioners and amicus curiae Ecological Rights Foundation (ERF) assert the application of CEQA in this case is a matter of self-governance by a political subdivision of the state, meaning federal preemption would run afoul of the Tenth Amendment of the federal Constitution. We assume, without deciding, that a private individual has standing to raise this issue. (See *Bond v. United States* (2011) __ U.S. __ [131 S. Ct. 2355, 2365] [individual may raise 10th Amendment claim in an appropriate case].)

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It gives a state "near plenary authority to allocate governmental responsibilities among its political subdivisions" (*Bacon v. City of Richmond, Virginia* (4th Cir. 2007) 475 F.3d 633, 641), which may not be intruded upon by the federal government absent "unmistakably clear" language in the federal statute. (*Gregory v. Ashcroft* (1991) 501 U.S. 452, 467 [state law requiring state court judges to retire at age 70 not subject to federal age discrimination law absent explicit provision to the contrary].)

35

ERF asserts this case is controlled by *Nixon v. Missouri Municipal League* (2004) 541 U.S. 125 (*Nixon*), in which municipalities within Missouri challenged a state law forbidding political subdivisions of the state from providing telecommunications services. The municipalities argued the law was preempted by the federal Telecommunications Act of 1996 (TCA; 47 U.S.C. § 253), which provided, "No State . . . may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." The court concluded the TCA did not preempt Missouri's governance of its own political subdivisions because a clear evidence of congressional intent to do so was lacking, the phrase "ability of any entity" not being limited to a single interpretation. (*Id*. at pp. 140-141.)[8]

The ICCTA, by contrast, expressly preempts all state laws " ' "that may reasonably be said to have the effect of managing or governing rail transportation." ' " (*Burlington Northern*, *supra*, 209 Cal.App.4th at p. 1528.) This preemption encompasses state laws such as CEQA involving environmental preclearance requirements. "[R]ailroads are instrumentalities of interstate commerce over which Congress's authority to regulate even purely intrastate matters under the Commerce Clause has not been and cannot be doubted." (*CSX Transportation, Inc. v. Georgia Public Serv. Com.* (N.D.Ga. 1996) 944 F.Supp. 1573, 1586; see *Auburn*, *supra*, 154 F.3d at p. 1031 ["preemption of rail activity is a valid exercise of congressional power under the Commerce Clause"].) If Congress has the authority under the Commerce Clause to act, that action does not invade "the province of state sovereignty reserved by the Tenth Amendment." (*New York v. United States* (1992) 505 U.S. 144, 155-156; see *Board of County Comrs. v. U.S. E.E.O.C.* (10th Cir. 2005) 405 F.3d 840, 847, 850.) The ICCTA's

---

[8] Much of the discussion in *Nixon* focused on the futility of interpreting the TCA to preempt a restriction on utilities run by a government agency when that agency could only obtain the funding necessary to operate through the political decisions of the state. "Legal limits on what may be done by the government itself (including its subdivisions) will often be indistinguishable from choices that express what the government wishes to do with the authority and resources it can command." (*Nixon*, *supra*, 541 U.S. at p. 134.)

36

preemption of CEQA as a preclearance requirement to railroad operations does not violate the Tenth Amendment.

C. *Judicial Estoppel*

Petitioners argue NCRA and NWPRC are estopped from asserting CEQA is preempted by the ICCTA, because this argument is contrary to positions previously taken by those parties in judicial and quasi-judicial proceedings. We disagree.

"Judicial estoppel is an equitable doctrine designed to maintain the integrity of the courts and to protect the parties from unfair strategies. [Citations.] The doctrine prohibits a party from asserting a position in a legal proceeding that is contrary to a position he or she successfully asserted in the same or some other earlier proceeding." (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 121 (*Owens*).) Judicial estoppel may be found when " '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Ibid.*)

Because judicial estoppel is an equitable doctrine, "its application, even where all necessary elements are present, is discretionary." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422, and cases cited therein.) "Moreover, because judicial estoppel is an extraordinary and equitable remedy that can impinge on the truth-seeking function of the court and produce harsh consequences, it must be 'applied with caution and limited to egregious circumstances' [citations], that is, ' " 'when a party's inconsistent behavior will otherwise result in a miscarriage of justice.' " ' " (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 449 (*Minish*).)

On appeal, we "review the findings of fact upon which the application of judicial estoppel is based under the substantial evidence test. [Citation.] When the facts are undisputed, we independently review whether the elements of judicial estoppel have been

37

satisfied. [Citation.]" (*Owens*, *supra*, 220 Cal.App.4th at p. 121.) If the trial court has declined to apply the doctrine as an equitable matter, though the statutory elements were technically met, we review that decision for abuse of discretion. (*Ibid*.; *Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 9-10.)

Initially, we address petitioners' claim that our review should focus on the order overruling the demurrer, which concluded NCRA and NWPRC were judicially estopped from arguing CEQA was preempted by federal law. Petitioners argue that the interim order was binding and could not be revisited at the time of the hearing on the merits, lest one judge of the superior court act as a "one-judge appellate court." (*People v. Quarterman* (2012) 202 Cal.App.4th 1280, 1293 (*Quarterman*).) We disagree. A ruling on a demurrer is not final and, until entry of judgment, may be reconsidered and changed by the trial court, including a different judge of the trial court. (*Donohue v. State of California* (1986) 178 Cal.App.3d 795, 800-801; *Valvo v. University of Southern California* (1977) 67 Cal.App.3d 887, 892, fn. 3; *Collins v. Marvel Land Co.* (1970) 13 Cal.App.3d 34, 45.)

Turning to the merits, petitioners argue that NCRA and NWPRC should be judicially estopped from claiming the ICCTA preempts CEQA because (1) NCRA signed a number of documents indicating it would comply with CEQA in exchange for TCRP funds, (2) NWPRC's business plan indicted it would fully participate in the steps necessary to secure TCRP funding, and (3) both NCRA and NWPRC made representations in the *City of Novato* case that CEQA would be followed with respect to the work to be performed as a result of the consent decree.[9] Because the doctrine of judicial estoppel rests on the inconsistency of the positions taken, we examine whether NCRA or NWPRC ever asserted in a prior judicial or quasi-judicial proceeding that the ICCTA did not preempt CEQA.

As to statements or representations made to Caltrans or CTC, there is no judicial or quasi-judicial administrative proceeding at issue, and no prior contrary position taken

---

[9] Although CAT suggests both NCRA and NWPRC made additional representations to the STB, the argument is not developed.

by NCRA or NWPRC. NCRA may have agreed as a contractual matter to comply with CEQA to secure certain state funds for repairs of the line, but the parties have directed us to no representations made by NCRA with respect to federal preemption and its applicability to railroad operations. If the state believes NCRA has violated the terms of its funding agreement, it is certainly free to pursue whatever remedies are available, but no "contrary position" was taken by NCRA that would justify the extraordinary step of utilizing judicial estoppel to decide the significant issue of federal preemption.

Though the *City of Novato* litigation was a proceeding to which the doctrine of judicial estoppel might apply, petitioners have not demonstrated NCRA or NWPRC took a contrary position with respect to federal preemption that was adopted by the court. The consent decree that ended the litigation called for certain construction work to be performed subject to CEQA within Novato, and stated that such activities "do not constitute an unreasonable burden on interstate commerce." But, like the documents pertaining to TCRP funds, the consent decree did not address the federal preemption of CEQA with respect to rail operations, or even with respect to construction and repair work outside the scope of the decree.

Petitioners argue NCRA took a contrary position with respect to ICCTA preemption because it indicated it would be preparing an EIR for railroad operations when it opposed a preliminary injunction in the *City of Novato* litigation, "claiming that an [EIR] was not necessary for the construction work itself, but was necessary only for the planned operation of the railway." In response to an amicus brief regarding the injunction, NCRA noted that but for its acceptance of state funds, the CEQA review at issue in that case would be totally preempted. NCRA was at that point assuming (at least for the sake of argument) an EIR would be prepared as to operations, but this is different than urging the court to rule that ICCTA did not preempt CEQA.

In any event, the trial court in *City of Novato* did not adopt any position with respect to preemption when it ruled on the application for an injunction. Judicial estoppel does not apply when the party stating an inconsistent position did not induce the tribunal to adopt the earlier position or to accept it as true, because "[i]f the party did not succeed,

39

then a later inconsistent position poses little risk of inconsistent judicial determinations and consequently introduces ' "little threat to judicial integrity." ' [Citation.]" (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.)[10] Here, the court granted the injunction in part, enjoining NCRA from commencing work that had not yet been started, but it made no orders with respect to CEQA and its application to rail operations. NCRA and NWPRC later filed a demurrer (overruled by the court) that asserted federal preemption as a defense to the city's CEQA challenge, a position consistent with the preemption defense in the current proceedings.

Even if we assume the elements of judicial estoppel were satisfied, the trial court declined to apply the doctrine due to policy reasons, stating in its order: "[A]pplication of the doctrine of judicial estoppel in these proceedings would burden the STB's exclusive jurisdiction to regulate the freight rail operation at issue here without interference from State remedies, and thereby defeat an important public regulatory function granted to the STB under the [ICCTA]." The trial court had the discretion to forgo the application of judicial estoppel for equitable reasons, and it did not abuse its discretion here. (*Owens*, *supra*, 220 Cal.App.4th at p. 121.)

Petitioners analogize this case to *People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181 (*Torch Energy*), in which an oil company had agreed to certain conditions so the county would issue an operating permit. (*Id*. at p. 184.) Its successor in interest expressly agreed to the same conditions, and obtained additional permits on the same basis, waiving any objection to those conditions. (*Id*. at pp. 184-185.) A number of years passed without challenge to the permitting requirements on the basis of federal preemption, and after an oil spill, the county sought civil fines and penalties based on alleged violation of the permit conditions. (*Ibid*.) Though the area of pipeline safety was preempted by federal law, the trial court decided the oil company was estopped from claiming this defense (*id*. at p. 185), and the Court of Appeal "exercise[d]

---

[10] A possible exception to the "success" element exists when the party has made " 'an egregious attempt to manipulate the legal system.' " (*Minish*, *supra*, 214 Cal.App.4th at pp. 453-454.) No such attempt is at issue in this case.

40

[its] discretion and appl[ied] judicial estoppel to prevent Torch from escaping a long-established commitment to comply with the County's regulations" (*id*. at p. 195).

We question whether *Torch Energy* correctly extended the doctrine of judicial estoppel to representations made to a county to obtain a permit.  (See *Embassy LLC v. City of Santa Monica* (2010) 185 Cal.App.4th 771, 778 [rejecting city's argument that landowner was judicially estopped by its failure to challenge permit conditions upon the granting of a special permit:  "We cannot see that the doctrine of judicial estoppel is applicable.  There was no tribunal to adopt a position or accept it as true, and the doctrine simply makes no sense in this circumstance"].)  In any event, the court in *Torch Energy* was reviewing a discretionary call by the trial court and applying its own discretion to the facts before it.  It does not stand for the proposition it would have been an abuse of discretion to decline to apply judicial estoppel in the situation presented.  (*Thompson v. Automobile Club of Southern California* (2013) 217 Cal.App.4th 719, 726-727 [that one court might view facts or legal issues differently than another does not demonstrate abuse of discretion].)

Nor does NCRA's preparation of an EIR operate as an estoppel to its current position no EIR was required.  In *Del Cerro Mobile Estates v. City of Placentia* (2011) 197 Cal.App.4th 173, 180 (*Del Cerro*), the court held an agency that prepared an EIR for a road grade separation project did not forfeit its right to argue no EIR was required because a CEQA exemption applied.  Quoting *Santa Barbara County Flower and Nursery Growers Association v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 876, the court explained, " 'Under the doctrine of equitable estoppel, a party cannot deny facts that it intentionally led another to believe if the party asserting estoppel is ignorant of the true facts, and relied to its detriment. . . . Nothing in the record shows that the [challenger] was unaware of the exemption, or that the County's decision to prepare an EIR prevented the [challenger] from ascertaining the applicable law.' " (*Del Cerro*, at pp. 179-180.)

Finally, we reject FOER's argument that the consent decree in the *City of Novato* case operates as issue preclusion, or collateral estoppel, on the issue of federal

41

preemption. Collateral estoppel applies when (1) the issue to be decided is identical to one decided in a previous proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided in the previous proceeding; (4) the prior decision was final and on the merits; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party in the previous proceeding. (*Quarterman*, *supra*, 202 Cal.App.4th at p. 1288.)

The first prong necessary for collateral estoppel is not met. The parties in the *City of Novato* case addressed the type of CEQA review to be applied to certain work to rehabilitate the line, but that is a different issue than whether the ICCTA preempts CEQA with respect to railroad operations. Though FOER asserts the court in *City of Novato* "ruled that Respondents cannot rely on ICCTA preemption to shield the Project from CEQA," this ruling was part of an order overruling the demurrer in that case, not a part of the consent decree and stipulated judgment itself. There was no final ruling on the merits on the issue of federal preemption of CEQA with respect to railroad operations.

## IV. DISPOSITION

The judgment (order denying the petitions for writ of mandate) is affirmed. Respondents NCRA and NWPRC are entitled to ordinary costs on appeal.

                                                            _____
                                                            NEEDHAM, J.


We concur.


_____
JONES, P. J.


_____
BRUINIERS, J.


(A139222, A139235)

Marin County Superior Court Case No. CIV1103591, Faye D'Opal, Judge.

Marin County Superior Court Case No. CIV1103605, Roy O. Chernus, Judge.

Shute Mihaly & Weinberger, Ellison Folk, Amy J. Bricker, Edward T. Schexnayder and Laura D. Beaton for Plaintiff and Appellant Friends of the Eel River.

Law Offices of Sharon E. Duggan and Sharon E. Duggan for Plaintiff and Appellant Californians for Alternatives to Toxics.

Klamath Environmental Law Center and William Verick for Plaintiff and Appellant Californians for Alternatives to Toxics.

Helen H. Kang and Ashley Pellouchoud, Environmental Law and Justice Clinic at Golden Gate University School of Law for Plaintiff and Appellant Californians for Alternatives to Toxics.

Deborah A. Sivas, Environmental Law Clinic, Mills Legal Clinic at Stanford Law School for Plaintiff and Appellant Californians for Alternatives to Toxics.

Sean B. Hecht, Frank G. Wells Environmental Law Clinic at UCLA School of Law for Natural Resources Defense Council, Planning and Conservation League, and Sierra Club as Amici Curiae on behalf of Plaintiff and Appellant.

Fredric Evenson and Brian Acree for Ecological Rights Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Neary & O'Brien, Christopher J. Neary for Defendants and Respondents North Coast Railroad Authority and Board of Directors of North Coast Railroad Authority.

Cox, Castle & Nicholson, R. Chad Hales and Andrew B. Sabey for Real Party in Interest and Respondent Northwestern Pacific Railroad Company.

Law Office of Douglas H. Bosco and Douglas H. Bosco for Real Party in Interest and Respondent Northwestern Pacific Railroad Company.

(A139222, A139235)

44